# EXHIBIT A

# STATE OF NORTH CAROLINA

HENDERSON _____ County

File No.
**26CV001332-440**

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| Name Of Plaintiff ROBERT H. COOPER, individually and as Administrator of the Estate of NATHALIE COOPER, deceased, | |

Address
PO Box 7008

City, State, Zip
Rocky Mount, NC 27804

## CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

### VERSUS

Name Of Defendant(s)
Hendersonville NC OPCO LLC d/b/a Orchard Valley Health and Rehabilitation; Accordius Health at Hendersonville LLC; Accordius Health LLC; Pisgah Holdco LLC; NC M53 SPE OPCO Holdco LLC; The Portopiccolo Group LLC; Ascent Healthcare Management NC LLC; Mountain Home Propco LLC; Yisroel Friedman; Israel Friedman; Simcha Hyman and Naftali Zanziper

Date Original Summons Issued

Date(s) Subsequent Summons(es) Issued

### To Each Of The Defendant(s) Named Below:

| Name And Address Of Defendant 9 | Name And Address Of Defendant 10 |
|---|---|
| YISROEL FRIEDMAN<br>3512 Quentin Road, Suite 200<br>Brooklyn, NY 11234 | ISRAEL FRIEDMAN<br>3512 Quentin Road, Suite 200<br>Brooklyn, NY 11234 |



**IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out! You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales. ¡NO TIRE estos papeles!**
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

### A Civil Action Has Been Commenced Against You!

You are notified to appear and answer the complaint of the plaintiff as follows:  **AND Plaintiff's Request for Admissions to Defendants**

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff) | Date Issued | Time |
|---|---|---|
| **Carmaletta L. Henson**<br>**HENSON FUERST, P.A.**<br>**PO Box 7008**<br>**Rocky Mount, NC 27804** | 6/10/2026 | 8:12:04 am ☐ AM ☐ PM |
| | Signature /s/ Christina Goodson | |
| | ☐ Deputy CSC ☒ Assistant CSC ☐ Clerk Of Superior Court | |

| | Date Of Endorsement | Time |
|---|---|---|
| ☐ ENDORSEMENT (ASSESS FEE)<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | | ☐ AM ☐ PM |
| | Signature | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

Case 1:26-cv-00203-MOC-WCM    Document 1-2    Filed 07/13/26    Page 2 of 92

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 9

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant **YISROEL FRIEDMAN** |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: (type or print name) | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 10

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant **ISRAEL FRIEDMAN** |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: (type or print name) | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (type or print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

NORTH CAROLINA

COUNTY OF HENDERSON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
26CV001332-440

ROBERT H. COOPER, individually and as
Administrator of the Estate of
NATHALIE COOPER, deceased, )

        Plaintiff, )

         )

v. )

         )

HENDERSONVILLE NC OPCO LLC d/b/a )
Orchard Valley Health and Rehabilitation; )
ACCORDIUS HEALTH AT )
HENDERSONVILLE LLC; )
ACCORDIUS HEALTH LLC; )
PISGAH HOLDCO LLC; )
NC M53 SPE OPCO HOLDCO LLC; )
THE PORTOPICCOLO GROUP LLC; )
ASCENT HEALTHCARE MANAGEMENT )
NC LLC; )
MOUNTAIN HOME PROPCO LLC; )
YISROEL (a/k/a ISRAEL) FRIEDMAN;
SIMCHA HYMAN; and
NAFTALI ZANZIPER,

        Defendants.

**PLAINTIFF'S FIRST
REQUESTS FOR ADMISSIONS
TO DEFENDANTS**

**[N.C.R.Civ.Pro. 36]**

**SERVED WITH COMPLAINT**

I hereby serve upon you the following Requests for Admissions, under the provisions of

Rule 36 of the North Carolina Rules of Civil Procedure. Since you are a corporation, you are

required to select such officer or agent of said corporation as can best furnish information

and answers to each question.

Pursuant to Rule 36 of the North Carolina Rules of Civil Procedure, you are hereby

requested within the time allowed by the North Carolina Rules of Civil Procedure after

service of these requests to make the following admissions for the purpose of this action

only.

1

Case 1:26-cv-00203-MOC-WCM   Document 1-2   Filed 07/13/26   Page 4 of 92

This set of Request for Admissions is served together with the Complaint in this action.

## REQUESTS FOR ADMISSION

Admit that each of the following statements is true:

1. You were properly served with the Complaint in this matter.

**HENDERSONVILLE NC OPCO LLC d/b/a Orchard Valley Health and Rehabilitation:**

**ACCORDIUS HEALTH AT HENDERSONVILLE LLC:**

**ACCORDIUS HEALTH LLC:**

**PISGAH HOLDCO LLC:**

**NC M53 SPE OPCO HOLDCO LLC:**

**THE PORTOPICCOLO GROUP LLC:**

**ASCENT HEALTHCARE MANAGEMENT NC LLC:**

**MOUNTAIN HOME PROPCO LLC:**

**YISROEL (a/k/a ISRAEL) FRIEDMAN:**

**SIMCHA HYMAN:**

**NAFTALI ZANZIPER:**

2. You were properly served with the Summons in this matter.

**HENDERSONVILLE NC OPCO LLC d/b/a Orchard Valley Health and Rehabilitation:**

**ACCORDIUS HEALTH AT HENDERSONVILLE LLC:**

**ACCORDIUS HEALTH LLC:**

**PISGAH HOLDCO LLC:**

2

**NC M53 SPE OPCO HOLDCO LLC:**

**THE PORTOPICCOLO GROUP LLC:**

**ASCENT HEALTHCARE MANAGEMENT NC LLC:**

**MOUNTAIN HOME PROPCO LLC:**

**YISROEL (a/k/a ISRAEL) FRIEDMAN:**

**SIMCHA HYMAN:**

**NAFTALI ZANZIPER:**

This the 11th day of June, 2026.

HENSON FUERST, P.A.

By: /s/Carmaletta L. Henson
Carmaletta L. Henson
carma@lawmed.com
State Bar No.: 26494 NC
P.O. Box 7008
2317 Sunset Avenue
Rocky Mount, NC 27804-7008
Telephone: (252) 443-2111
Service email:service@lawmed.com

3



STATE OF NORTH CAROLINA

COUNTY OF HENDERSON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
26 CV _____
26CV001332-440

ROBERT H. COOPER,
Administrator of the Estate of
NATHALIE COOPER, deceased,

    Plaintiff,

    v.

HENDERSONVILLE NC OPCO LLC d/b/a
Orchard Valley Health and Rehabilitation;
ACCORDIUS HEALTH AT HENDERSONVILLE LLC;
ACCORDIUS HEALTH LLC;
PISGAH HOLDCO LLC;
NC M53 SPE OPCO HOLDCO LLC;
THE PORTOPICCOLO GROUP LLC;
ASCENT HEALTHCARE MANAGEMENT NC LLC;
MOUNTAIN HOME PROPCO LLC;
YISROEL (a/k/a ISRAEL) FRIEDMAN;
SIMCHA HYMAN; and
NAFTALI ZANZIPER.

    Defendants.

COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Robert H. Cooper, as Administrator of the Estate of Nathalie Cooper, deceased, by and through undersigned counsel, hereby files this Complaint against Defendants, and alleges as follows:

## I.  SUMMARY OF THE CASE

1. This is a civil action for wrongful death, survival damages, severe personal injuries, sexual assault, medical malpractice, unfair and deceptive trade practices, and punitive damages arising from the conduct of Defendants in connection with the residency, care, sexual assault, and death of Nathalie Cooper ("Mrs. Cooper"), a 100-year-old United States Navy WAVES veteran and resident of the skilled nursing facility located at 200 Heritage Circle, Hendersonville, North Carolina, from March 21, 2022 through June 15, 2024.

1

2. At approximately 1:00 a.m. on June 12, 2024, Mrs. Cooper was anally raped in her own bed at the skilled nursing facility then known as Orchard Valley Health and Rehabilitation (hereinafter "Facility") by a male resident with serious mental illness, who had spent almost five years incarcerated for multiple felony convictions, the last incarceration having ended less than three months earlier, and who had been admitted to the Facility just days earlier without, upon information and belief, an adequate pre-admission screening for mental illness, and without an appropriate behavioral-supervision protocol.

3. Mrs. Cooper, bedbound by an undiagnosed femoral fracture that the Facility had failed to identify or treat for the preceding twenty-five days, was incapable of resisting or summoning help. She died three days later, on June 15, 2024, from the combined physiological and psychological trauma of the assault, the unaddressed fracture, and her compromised health status.

4. Mrs. Cooper's assault and death were not the product of any isolated lapse. They were the foreseeable and foreseen consequence of chronic understaffing, a dangerous-admissions practice, a documented pattern of dismissed reports of sexually predatory resident behavior, repeated federal regulatory deficiency citations electronically transmitted to the corporate principal months before the Change of Ownership Defendants now invoke to disclaim responsibility, and a multi-entity corporate structure designed to extract cash from the operating enterprise and to render it judgment-proof.

5. The conduct pleaded herein is, at a minimum, willful and wanton within the meaning of N.C. Gen. Stat. § 1D-5(7) and supports the imposition of punitive damages under <u>N.C. Gen. Stat. § 1D-15</u>.

## II. PARTIES

### A. Plaintiff

6. Plaintiff ROBERT H. COOPER ("Plaintiff"), is a citizen and resident of Henderson County, and brings this action as the duly appointed Administrator of the Estate of Nathalie Cooper, deceased, by appointment of the Clerk of Superior Court of Henderson County, North Carolina, (Estate File 25E000928-440), including pursuant to N.<u>C. Gen. Stat. §§ 28A-18-1</u> (survival) and 28A-18-2 (wrongful death).

2

### B. The Decedent

7. Nathalie Cooper ("Mrs. Cooper" or "Nan") was 100 years of age at the time of her death on June 15, 2024. From 1943 to 1946, Mrs. Cooper served her country as a member of the United States Navy Women Accepted for Volunteer Emergency Service ("WAVES").

8. Mrs. Cooper was a wife, a Navy veteran, and an accomplished artist whose paintings included a self-portrait and a portrait of the Reverend Dr. Martin Luther King, Jr.

9. She and her husband Robert H. Cooper shared a sixty-year long marriage and a daily love of puzzles, reading, and quiet routine.

10. On March 21, 2022, Mr. Cooper chose to entrust his wife to the care of the Defendants by placing his wife at the Facility (as hereinafter defined), as it was within walking distance of his home, allowing him to visit her frequently.

### C. The Facility

11. The skilled nursing facility at the center of this action (the "Facility") is located at 200 Heritage Circle, Hendersonville, Henderson County, North Carolina 28791. It is licensed by the State of North Carolina under license number NH0382 (Facility ID 923245), with a total bed capacity of 134. It is certified by the federal Centers for Medicare & Medicaid Services ("CMS") under CMS Certification Number ("CCN") 345285 and assigned NPI 1063283125. The Facility has operated continuously under that CCN since June 30, 1988, under successive trade names during the period relevant to this Complaint:

    a. "Accordius Health at Hendersonville," as licensed to Accordius Health at Hendersonville LLC, from at least January 1, 2021 through December 31, 2023;

    b. "Orchard Valley Health and Rehabilitation," as licensed to Accordius Health at Hendersonville, LLC, from January 1, 2024, to the December 31, 2024; and

    c. "Orchard Valley Health and Rehabilitation," as licensed to Hendersonville NC Opco, LLC, from January 1, 2024 (pursuant to a CHOW entered in 2025) through the present.

12. Throughout this Complaint, the Facility is referred to interchangeably as the "Facility," "the nursing home," and as "Orchard Valley."

3

13. The Facility is, and at all relevant times was, a "nursing home" licensed under Chapter 131E of the General Statutes of North Carolina and is, and at all relevant times was, a "health care provider" within the express meaning of N.C. Gen. Stat. § 90-21.11(1)(a) and (b). All claims asserted in this Complaint that arise out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by the Facility — and all related claims for breach of administrative or corporate duties to its residents (including, without limitation, claims for negligent staffing, monitoring, supervision, hiring, training, retention, and adoption and enforcement of policies and procedures) that arise out of the same facts as the professional-services claims — are "medical malpractice action[s]" within the meaning of N.C. Gen. Stat. § 90-21.11(2)(a) and (b).

## D. Corporate Defendants

14. **HENDERSONVILLE NC OPCO LLC** ("Hendersonville Opco") **is a North Carolina limited liability company** organized on November 1, 2022, under SOSID 2515952. Its principal office, as listed with the North Carolina Secretary of State, is located at 6047 Tyvola Glen Circle Suite 100, Charlotte, NC 28217. Its EIN is 93-1668931. It is the current licensed operator of the Facility and the CMS-enrolled provider for CCN 345285 with a Change of Ownership ("CHOW") effective date of January 1, 2024. Its registered agent in North Carolina is Interstate Agent Services LLC, 6047 Tyvola Glen Circle, Suite 100, Charlotte, North Carolina 28217. Defendant Israel Friedman is a Member of this Defendant, whose address is 3512 Quentin Road, Brooklyn, NY 11234.

15. At times relevant hereto, Hendersonville Opco, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

16. At times relevant hereto, and upon information and belief, Hendersonville Opco, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

4

17. Hendersonville Opco is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(a) (as the entity holding the Facility license under Chapter 131E and the CMS provider agreement) and § 90-21.11(1)(c)–(d) (as a person legally responsible for the negligence of, and acting at the direction or under the supervision of, the licensed nurses, certified nursing assistants, and physicians furnishing care at the Facility).

18. Consequently, Hendersonville Opco owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

19. **ACCORDIUS HEALTH AT HENDERSONVILLE LLC** ("Accordius Hendersonville") was the licensed operator of the Facility, and the CMS-enrolled provider for CCN 345285, throughout the period from at least January 1, 2021, through December 31, 2024, although a later entered CHOW changed the licensee to Hendersonville OpCo effective as of January 1, 2024, resulting in overlap. Accordius Hendersonville was organized and is doing business in the State of North Carolina at all times relevant hereto. Its principal office is located at 980 Sylvan Avenue, Englewood Cliffs, NJ 07632. Its registered agent is Interstate Agent Services LLC, located at 6047 Tyvola Glen Circle Suite 100, Charlotte, NC 28217. Defendant Simcha Hyman is the Member of this Defendant.

20. Accordius Hendersonville continued to be the holder of the active Medicare Electronic Funds Transfer ("EFT") account associated with the Facility from February 6, 2022, until June 5, 2025, a period that includes and extends beyond the dates of Mrs. Cooper's assault and death.

21. At times relevant hereto, Accordius Hendersonville, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

22. At times relevant hereto, and upon information and belief, Accordius Hendersonville, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

5

23. Accordius Hendersonville is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(a), (c), and (d) for the same reasons set forth in the preceding paragraphs.

24. Consequently, Accordius Hendersonville owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

25. **ACCORDIUS HEALTH LLC** ("Accordius Health") is, on information and belief, an affiliated operating-services entity and the management company of the Facility, in the same corporate enterprise as Defendant Accordius Hendersonville. Accordius Health is a limited liability company organized under the laws of the State of New York, and is registered to do business and doing business in the State of North Carolina at all times relevant hereto. Its principal office is located at 980 Sylvan Avenue, Englewood Cliffs, NJ 07632, and its registered agent is Interstate Agent Services LLC at 6047 Tyvola Glen Circle Suite 100, Charlotte, NC 28217. Defendant Simcha Hyman is the Member of this Defendant.

26. At times relevant hereto, Accordius Health, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

27. At times relevant hereto, and upon information and belief, Accordius Health, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

28. Accordius Health is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of the licensed nurses, certified nursing assistants, and care providers at the Facility, and as a person acting at the direction or under the supervision of, or in supervisory or operational authority over, those licensed providers.

29. Consequently, Accordius Health owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

6

30. **PISGAH HOLDCO LLC** ("Pisgah Holdco") is a limited liability company which is organized and doing business in the State of North Carolina. Its principal office is located at 3512 Quentin Road, Suite 200, Brooklyn, NY 11234, the same address as the personal address of Defendant Friedman. Its registered agent is Capitol Corporate Services, Inc., located at 176 Mine Lake Court, Suite 100, Raleigh, NC 27615. Its EIN is 93-4935646.

31. As reported on CMS Form 855A Section 5, Pisgah Holdco holds a one hundred percent (100%) direct ownership interest in Defendant Hendersonville Opco effective January 1, 2024, and Defendant Yisroel Friedman holds a 100% ownership/managing control of Pisgah Holdco at all times related hereto.

32. At times relevant hereto, Pisgah Holdco, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

33. At times relevant hereto, and upon information and belief, Pisgah Holdco, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

34. Pisgah Holdco is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of the licensed providers furnishing care at the Facility through its 100% direct ownership of the Facility Operator, and as a person acting in supervisory authority over those providers.

35. Consequently, Pisgah Holdco owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

36. **NC M53 SPE OPCO HOLDCO LLC** ("NC M53") is a limited liability company organized in the state of Delaware, and doing business in the State of North Carolina at times relevant hereto. On information and belief, NC M53 was the holding company that exercised upstream ownership over Defendant Accordius Hendersonville during the predecessor-operator period preceding the alleged January 1, 2024, CHOW (Change of Ownership). NC M53 may be served through Interstate Agent Services, LLC, 1811 Silverside Road, Suite

7

260, Wilmington, DE 19810. Upon information and belief, Defendant Hyman is a Member of NC M53.

37. At times relevant hereto, NC M53, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

38. At times relevant hereto, and upon information and belief, NC M53, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

39. NC M53 is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for, and acting in supervisory authority over, the licensed providers furnishing care at the Facility during the predecessor-operator period.

40. Consequently, NC M53 owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

41. **THE PORTOPICCOLO GROUP LLC** ("Portopiccolo") is a New Jersey limited liability company doing business within the State of North Carolina. Its principal place of business is 440 Sylvan Avenue, Suite 240, Englewood Cliffs, New Jersey 07632, on the same street as the New Jersey principal office shared by Defendants Accordius Hendersonville, Accordius Health, and Ascent Management. Defendant Portopiccolo may be served at 440 Sylvan Avenue, Suite 240, Englewood Cliffs, New Jersey 07632, at its office at 1105 E County Line Rd., Suite 215, Lakewood, NJ 08701, at 200 Boulevard of the Americas, Suite 105, Lakewood, NJ 08701, or at its registered agent according to the New Jersey Secretary of State Filings, vState Filings LLC, 58 N. Main Street, Mullica Hill, NJ 08062. Defendant Hyman is co-founder, Member, Manager, and Chief Executive Officer of The Portopiccolo Group LLC. Defendant Zanziper is co-founded, Member, Manager and President of The Portopiccolo Group LLC.

8

42. Portopiccolo is, on information and belief, the ultimate parent in the chain that owned and operated the predecessor Facility operator and has acquired and operated multiple skilled-nursing facilities throughout the United States through a network of related operating, holding, real estate, and staffing entities of the kinds named as Defendants in this Complaint.

43. At times relevant hereto, Portopiccolo, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

44. At times relevant hereto, and upon information and belief, Portopiccolo, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

45. Portopiccolo is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of, and acting in operational and supervisory authority over, the licensed providers furnishing care at the Facility through its ownership, management, and control of the Predecessor Strand.

46. Consequently, Portopiccolo owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

47. **ASCENT HEALTHCARE MANAGEMENT NC LLC** ("Ascent Management") is a limited liability company organized under the laws of the State of North Carolina. Its principal office is located at 980 Sylvan Avenue, Englewood Cliffs, NJ 07632, and its registered agent is Interstate Agent Services LLC located at 6047 Tyvola Glen Circle Suite 100, Charlotte, NC 28217. Ascent Management is a management-services entity that performs centralized administrative, clinical, financial, and personnel functions for Defendant Hendersonville Opco and for a chain of skilled nursing facilities in Western North Carolina. Its New Jersey principal office is 980 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

9

48. Ascent Management operates as the chain home office of the Facility, notwithstanding Defendants' false denial of any chain home office affiliation on the Form 855A as more particularly alleged below.

49. At times relevant hereto, Ascent Management, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

50. At times relevant hereto, and upon information and belief, Ascent Management, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

51. Ascent Management is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of, and acting in operational and supervisory authority over, the licensed providers furnishing care at the Facility through its chain-home-office management functions, including admissions, staffing, clinical policies, compliance, and survey-response oversight.

52. Consequently, Ascent Management owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

53. **MOUNTAIN HOME PROPCO LLC** ("Mountain Home PropCo") is a limited liability company organized and existing in the State of North Carolina, with a principal office of 980 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Its registered agent is Interstate Agent Services LLC located at 6047 Tyvola Glen Circle Suite 100, Charlotte, NC 28217. Mountain Home PropCo is, on information and belief, the related-party real-estate entity that owns the land and improvements at 200 Heritage Circle, Hendersonville, North Carolina, and leased the same to the Facility licensee(s) under a triple-net lease, requiring the licensees to pay rent regardless of operating performance and to bear all property taxes, insurance, and maintenance.

10

54. At times relevant hereto, Mountain Home PropCo, by and through individuals or entities acting on its behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

55. At times relevant hereto, and upon information and belief, Mountain Home PropCo, by and through individuals or entities acting on its behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

56. Mountain Home PropCo is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of, and acting in operational and supervisory authority over, the licensed providers furnishing care at the Facility through its participation in the asset-light OpCo/PropCo structure and triple-net lease that dictated the financial parameters of facility operations.

57. Consequently, Mountain Home PropCo owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

**E. Individual Defendants**

58. **YISROEL FRIEDMAN** (also identified in certain corporate filings as "Israel Friedman") is, upon information and belief, a citizen of the State of New York, with a residential address of 3512 Quentin Road, Brooklyn, New York 11234. As reported by Defendant Hendersonville Opco on CMS Form 855A Section 6 effective January 1, 2024, Friedman is simultaneously

    (a) the 100% indirect owner, Member, Corporate Director, and Chief Operations Officer of Defendant Hendersonville Opco,

    (b) the Authorized Official of Defendant Hendersonville Opco who certifies its federal Medicare enrollment, EFT authorization, and health-insurance benefit agreements.

    (c) The Member, Organizer, Chief Operating Officer, and Manager of Ascent Healthcare Management NC LLC;

    (d) the Director of Staffing Coordination for Accordius Health; and

11

(e) a Member of Pisgah Holdco LLC.

59. Friedman additionally signed the North Carolina Articles of Organization for Hendersonville NC Opco LLC on October 31, 2022, in his dual capacity as Member and Organizer.

60. Friedman is the bridging principal whose personal continuity across both the Predecessor Strand and the Successor Strand demonstrates that the two strands are functionally a single enterprise.

61. At times relevant hereto, Defendant Friedman, directly and by and through individuals or entities acting on his behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

62. At times relevant hereto, and upon information and belief, Defendant Friedman, directly and by and through individuals or entities acting on his behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities

63. Defendant Friedman is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of, and acting in operational and supervisory authority over, the licensed providers furnishing care at the Facility in his multiple, simultaneous capacities as ultimate beneficial owner, Corporate Director, Chief Operating Officer, Authorized Official, Member, Organizer, and Manager of the Corporate Defendants and the chain home office.

64. Consequently, Defendant Friedman owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

65. **SIMCHA HYMAN** is, upon information and belief, a citizen of the State of New York. He is/was also, at times relevant hereto:

   a. a Member and Manager of Defendant Accordius Hendersonville;

   b. a Member of Defendant Pisgah Holdco;

   c. a manager of Defendant Accordius Health LLC;

12

d. the co-founder, Member, Manager, and Chief Executive Officer of The Portopiccolo Group LLC;

e. the Member and Organizer of Mountain Home Nursing and Rehabilitation LLC, the predecessor limited liability company that held the license to operate the Facility before the transition to the Accordius name;

f. a Member and Manager of Mountain Home PropCo; and

g. a principal of The Portopiccolo Group LLC and of the larger Portopiccolo/Accordius nursing-home network that has historically operated approximately ninety-four (94) skilled nursing facilities across at least eight states.

66. At times relevant hereto, Defendant Hyman, directly and by and through individuals or entities acting on his behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

67. At times relevant hereto, and upon information and belief, Defendant Hyman, directly and by and through individuals or entities acting on his behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

68. Defendant Hyman is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of, and acting in operational and supervisory authority over, the licensed providers furnishing care at the Facility in his multiple, simultaneous capacities as Member of the predecessor operator and of the Successor Strand HoldCo, Manager of Accordius Health LLC, and co-founder and CEO of the Portopiccolo parent.

69. Consequently, Defendant Hyman owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

70. **NAFTALI ZANZIPER** is, upon information and belief, a citizen of the State of New Jersey. Zanziper was, at times relevant hereto:

13

a. the "Senior Officer" of Defendant Accordius Health at Hendersonville LLC, as reflected in the license application submitted to the North Carolina Department of Health and Human Services in the years 2021, 2022, and 2023; and

b. the Co-Founder, Member, Manager, and President of The Portopiccolo Group, LLC.

71. Zanziper executed the January 1, 2024, Bill of Sale and Assignment and Assumption Agreement, the Operations Transfer Agreement dated December 28, 2023, and the Acknowledgment of Surrender of North Carolina State License NH0382, in each case as "Authorized Signatory" for Defendant Accordius Hendersonville. Zanziper thereby exercised dominion-and-control authority over Defendant Accordius Hendersonville at the moment of CHOW, the operating period during which the dangerous-admissions policy and chronic understaffing pleaded below were already in place.

72. At times relevant hereto, Defendant Zanziper, directly and by and through individuals or entities acting on his behalf, directly owned, operated, managed, maintained and/or controlled — in whole or in part — the facility at issue.

73. At times relevant hereto, and upon information and belief, Defendant Zanziper, directly and by and through individuals or entities acting on his behalf, was substantially and directly engaged in the leasing, control, management, staffing, fiscal budgeting, oversight, risk management, regulatory compliance, implementation and enforcement of policies and procedures, consultation with and/or operation of the skilled nursing facility at issue in this case and other related entities.

74. Defendant Zanziper is a "health care provider" within the meaning of N.C. Gen. Stat. § 90-21.11(1)(c) and (d), as a person legally responsible for the negligence of, and acting in operational and supervisory authority over, the licensed providers furnishing care at the Facility in his capacities as Senior Officer of the predecessor operator and Co-Founder/President of the Portopiccolo parent.

75. Consequently, Defendant Zanziper owed a duty to Nathalie Cooper to use reasonable care for her safety while she resided at the Facility.

**F. Collective References**

14

76. Where this Complaint refers to the "Corporate Defendants," it means jointly all of the above-named entity Defendants. Where it refers to the "Individual Defendants," it means jointly all of the above-named natural-person Defendants. Where it refers to "Defendants," it means all Corporate Defendants and all Individual Defendants jointly.

## III.  JURISDICTION AND VENUE

77. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

78. This Court has subject-matter jurisdiction over `this action pursuant to N.C. Gen. Stat. §§ 7A-240 and 7A-243. The amount in controversy exceeds twenty-five thousand dollars ($25,000.00), exclusive of interest and costs.

79. This Court has personal jurisdiction over each Defendant pursuant to N.C. Gen. Stat. §§ 1-75.4(1), (3), and (4), in that each Defendant is domiciled in, regularly conducts business in, owns or leases real property in, is licensed by the State of North Carolina to operate in, or has engaged in tortious conduct within the State of North Carolina that gave rise to this cause of action. Specifically, each Defendant has purposefully availed itself of the privilege of conducting activities within North Carolina by owning, operating, managing, financing, holding the license to, or providing professional services for a Henderson County, North Carolina skilled nursing facility serving North Carolina residents, and the exercise of personal jurisdiction over each Defendant comports with traditional notions of fair play and substantial justice.

80. Venue is proper in Henderson County pursuant to N.C. Gen. Stat. §§ 1-79 and 1-82, in that the Facility is located in Henderson County, North Carolina; the acts and omissions giving rise to this action occurred in Henderson County, North Carolina; the assault and death of Mrs. Cooper occurred in or arose from acts and omissions in Henderson County, North Carolina; and one or more Defendants regularly conduct business in Henderson County.

## IV. DEFINITIONS

For the convenience of the Court and the parties, the following defined terms apply throughout this Complaint:

15

81. **"Administrator"** means the licensed nursing home administrator with managerial control of the Facility as reported to NCDHHS DHSR and CMS at the relevant time, as required by N.C. Gen. Stat. § 90-278 et seq. and 10A N.C.A.C. 13D .2102.

82. **"Assailant"** means the male resident, identified in the June 21, 2024, Statement of Deficiencies as Resident #1 and identified on information and belief as Alan Greene, who anally raped Mrs. Cooper on or about June 12, 2024.

83. **"CHOW"** means a Change of Ownership within the meaning of 42 C.F.R. § 489.18 and the Medicare Provider Enrollment Application, CMS Form 855A.

84. **"CMS"** means the federal Centers for Medicare & Medicaid Services.

85. **"Director of Nursing"** or "DON" means the registered nurse designated by the Facility to direct nursing services under 42 C.F.R. § 483.35(b).

86. **"Facility"** means the 134-bed skilled nursing facility located at 200 Heritage Circle, Hendersonville, North Carolina 28791, holding NCDHHS license NH0382 and CMS CCN 345285, regardless of trade name in effect at the relevant time.

87. **"Health Care Provider" has the meaning ascribed to that term in N.C. Gen. Stat. § 90-21.11(1) and, as alleged above, includes each Defendant named in this Complaint.**

88. **"HPPD"** means "hours per patient day," a standard CMS staffing metric.

89. **"IJ"** means "Immediate Jeopardy," the highest level of CMS deficiency.

90. **"NCDHHS DHSR"** means the North Carolina Department of Health and Human Services, Division of Health Service Regulation.

91. **"OpCo"** and **"PropCo"** mean, respectively, the operating-company entity that holds the Facility license and provides care to residents, and the real-estate company entity that holds title to the Facility real property and leases it to the OpCo.

92. **"PASRR"** means the Preadmission Screening and Resident Review process required by 42 C.F.R. §§ 483.20(k) and 483.130.

93. **"PBJ"** means the CMS Payroll-Based Journal.

94. **"SOD"** or **"Form 2567"** means a CMS Statement of Deficiencies.

16

## V. FACTUAL BACKGROUND:

**Defendants' Participation in and Control of Nursing Home Operations and Financial Motive**

95. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

96. At all material times, Defendants represented to the public, including to Nathalie Cooper and her family, that Facility was licensed, certified and qualified to provide services under the Medicare and Medicaid programs.

97. At all material times, Defendants knew the delivery of essential custodial services to residents in skilled nursing facilities depended upon fundamental budgetary and operational decisions made, determined, controlled, monitored, and enforced by Defendants, including:

   a. The determination of the numbers and nature of staff and expenditures on staffing levels in the nursing home;

   b. The determination of census/occupancy levels within the nursing home;

   c. The determination of the census mix which established the amount of facility revenue and impacted the acuity level and care need of the nursing home residents; and

   d. The determination of which residents and what types of residents to admit into the facility.

98. Upon information and belief, in order to maximize corporate revenues and financial performance, Defendants intervened, interfered, and directly participated in the operations of the Facility by mandating perilous business policies and practices that were to be followed by their employees and agents and employees and agents of Defendants.

99. Upon information and belief, at all material times, Defendants, or one or more of them, exercised unrestricted control and sole discretion over the operation and management of the Defendants and the Facility specifically, during Nathalie Cooper's residency at Facility, including but not limited to, the creation, setting, funding and/or implementation of budgets; expenditures for staffing; revenue targets; census targets; creating and maintaining business relationships with related parties as defined by the Centers for Medicare Services that resulted in an undercapitalized and understaffed nursing home; the hiring, training, and supervision of

17

staff; the provision and supervision of resident care; the monitoring of resident acuity levels and staffing sufficient to meet each resident's needs; the development of policies and procedures, and control over resident admissions and discharges to and from the facility.

100. Each of these managerial and operational functions and decisions had a direct impact on the quality of care provided and delivered to Nathalie Cooper and other residents at their skilled nursing facilities, including Facility, and were taken in furtherance of an operational and managerial objective of Defendants.

101. Upon information and belief, Defendants' policies and practices required the aggressive recruitment, housing, and retention of high acuity residents, including dangerous residents and an increase in resident census/occupancy for which the Defendants, by and through their employees, agents and staff, could not adequately care. Defendants knew or should have known that Facility did not have adequate numbers of qualified and competent, properly trained staff to provide the residents, including Nathalie Cooper, the care and services required by law and by the applicable standard of care, and to protect the residents from abuse and neglect.

102. Upon information and belief, Defendants substantially derive their revenue and profits from the receipt of taxpayer dollars through federally and state funded Medicare and Medicaid programs.

103. Under Medicare, residents with higher acuity levels, i.e., a greater number and degree of illnesses and care needs, place higher demands for care and services on the nursing home and its staff.

104. The rate at which skilled nursing facilities accept Medicare dollars for the delivery of nursing home care and services, and accordingly the amount of their ultimate revenue and profits, are normally based upon the acuity level of the residents in their facilities.

105. Defendants had an incentive to maintain the highest possible occupancy and acuity level at Facility while minimizing patient care expenses, such as sufficient staff through the lack of employment of enough RNs, LPNs, and CNAs.

106. Defendants had an obligation to sufficiently staff its facilities, including Facility, based not only upon the number of residents residing in the facility but also the residents' total acuity

18

level. Put simply, the more services residents need, i.e., the higher the total acuity level, the more staff that is required.

107. Specifically, throughout 2023 and 2024 Defendants failed to ensure, through their operational, budgetary, consultation and managerial decisions and actions, that Facility was sufficiently and competently staffed to meet the individual needs of the residents, and to ensure that their safety and welfare was protected.

## A. Defendants' Corporate Structure and Change of Ownership

### 1. Two overlapping corporate strands operating a single continuous facility.

108. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

109. The Facility has continuously operated as a 134-bed Medicare- and Medicaid-certified nursing facility under three successive trade names without interruption of operations, license, residents, employees, or building.

110. Across that continuous operation, two overlapping corporate strands have controlled, owned, financed, and managed the Facility:

(a) a predecessor strand consisting of the Accordius Health network, NC M53, Defendants Hyman, Zanziper, and Portopiccolo (the "Predecessor Strand"); and

(b) a successor strand consisting of Defendants Pisgah Holdco, Hendersonville OpCo, Ascent Management, Mountain Home PropCo, and Friedman (the "Successor Strand").

111. On information and belief, the Predecessor Strand and Successor Strand are not arm's-length adversaries but are inter-related private-equity-style nursing-home enterprises that share common principals, common addresses, common back-office service vendors, common operational personnel, and a common pattern of asset-light operating companies ("OpCos") coupled to related-party real-estate companies ("PropCos"), management companies, and staffing companies, all of which extract revenue from the OpCo through related-party transactions while leaving the OpCo undercapitalized and judgment-proof.

19

112. Across both Strands, Defendant Friedman has been a continuous bridging principal, initially holding himself out under The Portopiccolo Group email domain and subsequently under the Ascent Healthcare Management domain, as more particularly alleged below.

### 2. *The January 1, 2024 CHOW was a paper restructuring.*

113. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

114. Effective January 1, 2024, the Facility underwent a Change of Ownership ("CHOW") within the meaning of 42 C.F.R. § 489.18 and the Medicare Provider Enrollment Application, CMS Form 855A.

115. Per the 2024 Medicare cost report Worksheet S-2, the legal operator of the Facility for the cost reporting period ending December 31, 2024 is Defendant Hendersonville Opco, the direct owner of which is Pisgah Holdco, and the ultimate beneficial owner of which is Defendant Friedman.

116. The Operations Transfer Agreement, Bill of Sale, Surrender of License, and related CHOW closing documents were signed on the transferor side by Defendant Zanziper, as "Authorized Signatory" for the predecessor operating entity (Accordius Hendersonville), and on the transferee side by Defendant Friedman, as Authorized Official for Hendersonville Opco using the email address israel@ascenthcmgmt.com.

117. Despite the CHOW, on information and belief:

   a. not a single resident was discharged or transferred as a result of the change;

   b. the State of North Carolina nursing home license NH0382 was not surrendered but was instead renewed under the same number;

   c. the Facility's CMS Provider Agreement under CCN 345285 was assigned to the successor by operation of 42 C.F.R. § 489.18(c), automatically transferring all rights, obligations, deficiencies, plans of correction, prior survey findings, and enforcement remedies of the predecessor;

   d. the Facility's (828) 693-5849, fax (828) 697-5707, physical plant, beds, certified bed complement, and resident roster remained unchanged;

20

e. the Medicaid Provider Number and National Provider Identifier remained the same; and

f. the same admissions, behavioral-management, supervision, and staffing policies in force on December 31, 2023 remained in force on June 12, 2024.

118. On August 7, 2024, after the CHOW and after Mrs. Cooper's death, the Facility's administrator transmitted regulatory correspondence to NCDHHS DHSR identifying the Facility as "Orchard Valley Health and Rehabilitation a (Accordius Health at Hendersonville)" (parenthetical in original), evidencing that the predecessor trade name remained in active operational use eight months after the CHOW and two months after Mrs. Cooper's death.

### 3. The seventeen-month EFT overlap.

119. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

120. Per CMS Form 588, the Facility's Medicare reimbursement EFT account established in the name of Defebdabt Accordius Hendersonville at Sterling National Bank was activated on February 6, 2022, and remained active for the receipt of Medicare reimbursements from the U.S. Treasury until June 5, 2025.

121. The successor operator, Hendersonville Opco, did not file a Form 588 designating a new bank account (at Webster Bank, on information and belief) until June 6, 2025 — seventeen months after the CHOW and a full year after Mrs. Cooper's death (the "EFT Overlap Period").

122. Throughout the EFT Overlap Period:

a) the Facility was operating under the successor's legal name and under the trade name "Orchard Valley Health and Rehabilitation";

b) The Facility was billing CMS under CCN 345285;

c) the Facility's Medicare reimbursements were being deposited into the predecessor's bank account, in violation of 42 C.F.R. § 424.510(d)(2);

21

d) Defendant Friedman, as Authorized Official for the successor, knew or should have known of the EFT Overlap. June 12, 2024 and June 15, 2024 both fall squarely within the EFT Overlap Period.

123. The EFT Overlap Period is a documentary admission of commingling of funds between the Predecessor Strand and the Successor Strand and is direct evidence that the corporate forms of Hendersonville NC OPCO LLC and Accordius Health at Hendersonville LLC have been treated by Defendants as fungible vessels for the receipt of Medicare revenues, precisely the kind of disregard of corporate formalities that supports veil-piercing, alter ego, single business enterprise, and successor-liability findings under North Carolina law. *See Glenn v. Wagner,* 313 N.C. 450, 458 (1985).

### *4. Friedman as the bridging principal.*

124. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

125. Friedman's ownership, management, and operational control of the Facility began at least eighteen months before the January 1, 2024 CHOW and continues to the date of this Complaint.

126. Per the August 4, 2022 ASPEN Electronic Plan of Correction ("ePOC") Distribution List produced by CMS for the July 5 – 11, 2022 recertification and complaint-investigation survey of the Facility, a survey that resulted in eleven federal F-tag citations, Defendant Friedman was a direct electronic recipient of the Statement of Deficiencies at the email address ifriedman@theportopiccologroup.com.

127. Per the December 11, 2024 CMS Civil Money Penalty Due Notice, Defendant Friedman was a direct electronic recipient of CMS enforcement correspondence at israel@ascenthcmgmt.com.

128. Defendant Friedman's migration from the @theportopiccologroup.com email domain (2022) to the @ascenthcmgmt.com email domain (2024) tracks the corporate migration of the Facility from the Predecessor Strand to the Successor Strand and confirms that the natural person making the operational and ownership decisions for the Facility before, during and after the CHOW was, and is, the same person.

22

### 5. Common Brooklyn address.

129.  The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

130.  Per the CMS Form 855A and supporting CHOW disclosures, Defendant Friedman's personal address of record, the principal office of Pisgah Holdco, and the principal office of Hendersonville Opco are all the same single address: 3512 Quentin Road, Brooklyn, New York 11234.

131.  The use of a single shared address by a natural-person ultimate beneficial owner, his direct-ownership holding company, and the operating company of the Facility is inconsistent with the maintenance of distinct corporate identities and is evidence of the absence of corporate formalities, a *Glenn v. Wagner* veil-piercing factor.

### 6. False Section 7 denial of chain home office affiliation.

132.  The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

133.  Section 7 of the CMS Form 855A requires the enrolling provider to disclose whether it is a member of a chain organization and identify the chain home office. The Form 855A submitted on behalf of Hendersonville Opco affirmatively denies any chain home office affiliation (the "Section 7 Denial").

134.  The contemporaneous documentary record establishes that Defendant Ascent Management in fact operates as the chain home office of the Facility and directs admissions, staffing, regulatory compliance, training, payroll, billing, and survey-response functions of the Facility, including in particular:

   a.  On June 18, 2024, six days after Mrs. Cooper's sexual assault, NCDHHS Facility Compliance Consultant Penny Ramsey transmitted the Facility's Allegation of Compliance for the F-600 citation tied to the Cooper assault simultaneously to Administrator Steve Hardin and to Kimberly Smith, VP of Operations for Ascent Healthcare Management, at ksmith@ascenthcmgmt.com. The subject line was "F 600 AOC," and the attached document was "F600 AOC.Orchard.6.12.24.docx";

23

b. On December 11, 2024, the CMS CMP Due Notice for the Cooper-period survey was sent jointly to Administrator Hardin (at the Facility email) and to Defendant Friedman (at israel@ascenthcmgmt.com), confirming that CMS itself treats Defendant Ascent Management as the home office;

c. Throughout 2024, regulatory correspondence to and from the Facility routinely cc'd Ascent personnel including Kimberly Smith(KSmith@ascenthcmgmt.com), Monica Knighten (MKnighten@ascenthcmgmt.com), and Jay Blanton (JBlanton@ascenthcmgmt.com), each of whom held themselves out as making operational decisions for the Facility;

d. The 2023 and 2024 Medicare cost reports report Ascent Healthcare Management NC LLC as a related-party recipient of management fees under Worksheet A-8-1.

135. The Section 7 Denial is a knowingly false certification to the federal government, made under penalty of perjury, and constitutes:

a. a deceptive business act in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1, exempt from the learned-profession defense because it is non-clinical, business-side conduct;

b. an attempted concealment of corporate involvement to shield the chain home office and the ultimate beneficial owner from liability; and

c. substantive evidence supporting the application of the alter ego, single business enterprise, and joint enterprise doctrines.

### 7. Asset-stripping: related-party extraction hollowing out the OpCo.

136. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

137. Defendants and their related entities extracted considerable profit through the management and operation of Facility by paying management, administration and consulting fees, as well as other "costs," to the Defendants named herein and other related entities from funds which should have been utilized to hire, train and retain sufficient numbers of qualified staff to meet the needs of and protect Nathalie Cooper and other residents.

24

138. Specifically, upon information and belief, Defendants engaged in transactions with each other, i.e., "related parties," as defined by the Centers for Medicare Services, at dollar amounts far exceeding fair market value and in contradiction of "prudent buyer" principles.

139. Per the 2024 Medicare cost report, the OpCo reported total fixed assets of only $149,376 against gross patient-service revenue of approximately $13.5 million, a ratio of approximately 1.1%.

140. Per the 2022, 2023, and 2024 Medicare cost reports, the OpCo reported cash and temporary investments of negative $23,999 (2022), approximately zero (2023), and $89,900 (2024), dangerously inadequate working capital for a 134-bed Medicare- and Medicaid-certified skilled nursing facility billing $13.5 million per year.

141. Per the 2024 Medicare cost report, the OpCo reported long-term liabilities of approximately $37.9 million, a figure that did not exist on the 2022 or 2023 cost reports.

142. The 2024 emergence of approximately $37.9 million in new long-term liabilities, simultaneous with the CHOW and accompanied by no comparable change in revenue, operating expenses, plant, or census, is on information and belief the product of intercompany loan or credit instruments executed in conjunction with the CHOW (the "CHOW Debt").

143. On information and belief, the CHOW Debt was structured to:

   a. impose on the OpCo a non-arm's-length obligation of nearly $38 million payable to affiliated entities controlled by Defendant Friedman;

   b. to consume the OpCo's reimbursable margin and free cash flow;

   c. to preclude the OpCo from satisfying creditor claims (including tort judgments); and

   d. thereby to implement a deliberate hollowing-out of the OpCo as a judgment-proof vessel.

144. Per Worksheet A-8-1 of the Facility's Medicare cost reports, the Medicare program disallowed in their entirety related-party rent payments of $1,480,000 in 2022 and $2,370,000 in 2023 to Mountain Home PropCo under 42 C.F.R. § 413.17(b)(1).

25

145. The fact that Medicare (a stranger to the parties) identified the rent as related-party and disallowed it in full establishes that the OpCo and Mountain Home PropCo are related parties and that the rent has been set above arm's-length levels for the purpose of moving cash from the OpCo to a related affiliate.

146. The OpCo's contract-labor expense expanded from approximately $276,000 in 2022 to approximately $3,530,000 in 2023, an approximately thirteen-fold increase in a single year.

147. On information and belief, a material portion of that 2023 contract labor expense was paid to a related entity, Daisy Staffing LLC, under non-arm's-length terms, in further violation of 42 C.F.R. § 413.17(b)(1) and in further extraction of OpCo cash to an affiliated entity.

148. Per the Facility's Medicare cost reports, the OpCo reported management fees and other amounts paid to related parties of $2,701,506 in 2022 and $3,459,370 in 2023.

149. The current figure reported on the 2024 cost report is $0. This figure is implausible given the continued involvement of Ascent Healthcare Management as the chain home office throughout 2024, and on information and belief either a cost-report misclassification or evidence of further intercompany restructuring obscuring the true flow of OpCo cash.

### 8. Outsourcing to Apex and Global Healthcare.

150. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

151. On information and belief, the OpCo's revenue-cycle management, billing, payroll, purchasing, finance, IT, and other back-office functions are outsourced to a network of related-party service vendors, including Apex Global Solutions / AXG Solutions and Global Healthcare Fiscal Services Group LLC.

152. This outsourcing of essentially all back-office and revenue-cycle functions to these vendors, coupled with the chain-home-office function performed by Defendant Ascent Management, leaves the OpCo as little more than a billing identity, without independent finance, billing, payroll, purchasing, IT, or compliance capacity, and confirms the OpCo's status as a mere instrumentality of Defendant Friedman and his related-party network.

26

## B. Chronic Understaffing Documented in Defendants' Own PBJ Submissions

### 1. The PBJ reporting system.

153.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

154.    Since 2016, the Centers for Medicare & Medicaid Services ("CMS") has required every Medicare- and Medicaid-certified nursing facility to submit auditable, payroll-derived staffing data on a quarterly basis through the Payroll-Based Journal. See 42 C.F.R. § 483.70(p). PBJ submissions are made under penalty of federal sanction and are required to be based on actual payroll records.

155.    The PBJ data described in this Complaint is therefore Defendants' own admission to the federal government of the staffing levels they did, in fact, provide on each day of operation.

156.    PBJ data is reported in hours per resident day ("HPPD"). Throughout this Complaint, HPPD figures are calculated using the inclusive direct-care formula, inclusive of LPN administrative time, the most defendant-favorable computation available from the PBJ data.

### 2. The annual staffing pattern across Change of Ownership:

157.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

158.    Defendants' own PBJ submissions report the following annual averages:

    a.    calendar year 2023: annual average Daily HPPD of 2.89, floor RN HPPD of 0.30;

    b.    calendar year 2024 (the year of Mrs. Cooper's death): annual average Daily HPPD of 2.64, floor RN HPPD of 0.30;

    c.    calendar year 2025 through September 30, 2025: annual average Daily HPPD of 2.84, floor RN HPPD of 0.37. These levels are far below the staffing benchmarks associated with safe care.

159.    These levels are far below the staffing benchmarks associated with safe care.

### 3. The first half of 2024 and the period surrounding the assault.

27

160. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

161. In the first half of 2024, conditions were materially worse than annual averages.

162. From January 1, 2024 through June 30, 2024, the Facility averaged Daily HPPD of 2.45 and floor RN HPPD of 0.28. Defendants reported thirty-eight (38) days in 2024, nearly 14% of the days for which they submitted PBJ data, below 2.0 HPPD even with LPN administrative time included; eighty-one (81) days below 2.5 HPPD; and 193 days — over 70% of the year — below 3.0 HPPD.

163. In January 2024 alone, the Facility reported single-day Daily HPPD figures of:

   a. 0.66 on Sunday, January 21;

   b. 0.75 on Saturday, January 20;

   c. 0.87 on Sunday, January 28; and

   d. 0.90 on Sunday, January 7, on a census of 102–107 residents.

164. On each of these days, the Facility was, by its own admission to CMS, providing less than one full hour of direct nursing care per resident for the entire 24-hour day.

165. On June 12, 2024, the date of the assault, Defendant Hendersonville Opco's PBJ submission reported a census of 101 residents and Daily HPPD (inclusive of LPN administrative time) of 2.78.

166. On June 12, 2024, floor RN coverage was 15.83 hours for the entire 24-hour day for 101 residents, a floor RN HPPD of 0.16, or roughly nine and a half minutes of floor RN time per resident across all three shifts combined.

167. On June 12, 2024,, CNA coverage was seventy-seven percent (77%) contract, with 149.11 contract CNA hours versus 43.68 employee CNA hours.

168. On June 15, 2024 (the date of death), Hendersonville Opco reported a census of 97 residents, Daily HPPD of 2.69, LPN HPPD of 0.16, and zero (0.00) Director of Nursing hours. LPN coverage was 71% contract.

*4. The weekend staffing cliff and zero-DON-on-weekends.*

28

169. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

170. The PBJ data establishes that in calendar year 2024, the Facility averaged Daily HPPD of 2.73 on weekdays but only 2.41 on weekends — a twelve percent (12%) drop on the days when fewer residents have visiting family members.

171. More starkly, Defendants reported zero Director of Nursing hours on all 78 weekend days of 2024 (100% of weekends).

172. The death of Mrs. Cooper occurred on Saturday, June 15, 2024 — a day on which, by Hendersonville Opco's own admission to CMS, the Director of Nursing did not work a single hour at the Facility.

### 5. Reliance on contract and agency labor.

173. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

174. Defendants' reliance on contract and agency nursing labor across the relevant period confirms management's awareness of, but failure to remedy, the staffing crisis.

175. In 2024, contract labor constituted approximately thirty percent (30%) of RN hours, eighty-four percent (84%) of LPN hours, and fifty-three percent (53%) of CNA hours.

176. In June 2024, the month of the Assault, contract labor accounted for approximately seventy-six percent (76%) of LPN hours and approximately seventy-two percent (72%) of CNA hours.

177. On June 12, 2024, 77% of CNA hours and 64% of LPN hours were contract.

178. Upon information and belief, Daisy Staffing LLC, a related party, was a principal supplier of the contract labor.

179. The Corporate Defendants' substitution of related-party contract labor for direct-employed nursing staff served two related purposes:

    a. It concealed the depth of the direct-employee staffing crisis by inflating headline staffing figures with transient workers; and

b. It channeled additional facility revenue to related parties controlled by the same principals.

### 6. The third-quarter 2024 PBJ data gap.

180. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

181. Defendant Hendersonville Opco failed to submit daily PBJ data to CMS for the third quarter of 2024 — the calendar quarter immediately following Mrs. Cooper's death.

182. From July 1, 2024 through September 30, 2024, the PBJ record reflects zero reported days, an omission that, on information and belief, reflects an effort to obscure post-incident staffing conditions from federal regulators and the public.

183. The failure to provide sufficient nursing staff resulted in residents not being properly supervised, assessments not being conducted as needed, in inaccurate assessments and documentation, in care plans not being properly developed and implemented, and ultimately resulted in the rape of and the death of Mrs. Cooper.

### C. The Dangerous-Admissions Policy and Prior Notice of Sexual Predation

### 1. Admission of the Assailant.

184. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

185. The Assailant who entered Mrs. Cooper's bed in the early-morning hours of June 12, 2024 had been admitted to the Facility on June 3, 2024, nine days before the assault.

186. At the time of his admission, he suffered from a serious mental illness and cognitive impairment, had been incarcerated for almost five years for multiple felony convictions, and had been out of incarceration for less than three months at the time of his admission.

187. On information and belief, Defendants admitted the Assailant to the Facility without performing, or without acting upon:

30

a. the federally required PASRR Level II pre-admission screening adequate to identify his behavioral risk to other residents;

b. without imposing observation, segregation, or one-on-one supervision conditions on his admission; and

c. without notifying or obtaining the informed consent of Mrs. Cooper or her responsible party that such a resident would be housed in the same Facility.

188. Nurses at the facility were afraid of the Assailant themselves, as well as other residents. Some nurses refused to provide care to the Assailant alone, without taking another caregiver in the room with them.

189. The Assailant's admission was consistent with a pattern designed to maintain census and revenue.

190. The Defendants had a pattern and practice of accepting dangerous, high risk individuals as residents of the facility without regard for the safety concerns it created for other residents as well as their staff. In the words of staff members, the Defendants would "take anybody."

191. Individual nurses and caregivers complained about the dangerous admisions practice to the Administrator and Director of Nursing, to no avail.

192. Defendants were driven by a desire to have a large census, otherwise known in the industry as "heads in beds", as census drives revenue.

193. Defendants permitted residents to take drugs and alcohol into the facility and use it while there, with no consequences.

194. The Defendants continually admitted high-risk residents, including individuals:

a. with recent felony convictions,

b. individuals recently discharged from incarceration,

c. individuals with substance-use disorders, and

d. individuals without housing.

*2. Prior notice of sexual predation at the Facility.*

31

195. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

196. Defendants had actual notice, well before June 12, 2024, that the Facility's staffing levels and admissions practices were producing foreseeable sexual misconduct between residents.

197. A few months before the assault on Mrs. Cooper, the Facility was cited by NCDHHS DHSR for failing to report an "inappropriate touching" incident between residents.

198. A Facility nurse reported, prior to June 12, 2024, that the Assailant in this case, Alan Greene, began masturbating upon her entry into his room.

199. The Facility's Director of Nursing dismissed the report with the statement "Well, it's his right," and took no protective action with respect to other residents or to the staff who had reported the incident.

200. Other nurses had reported to Facility management, prior to June 12, 2024, that they were fearful of certain patient assignments because of dangerous resident behavior.

201. Each of the foregoing facts constituted direct notice to Defendants that, given the Facility's staffing levels, the supervisory infrastructure was incapable of preventing foreseeable resident-on-resident abuse, including sexual contact.

202. Defendants nevertheless continued to admit residents the Facility could not safely supervise, continued to retain residents whose behavior had triggered nursing reports, and continued to operate the Facility at the chronic understaffing levels pleaded above.

**D. *Corporate Malfeasance and Conscious Disregard***

203. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

204. Defendants' chronic understaffing, dangerous-admissions policy, and refusal to act upon documented reports of sexually predatory behavior were not the result of isolated lapses or unforeseen shortages. They were the product of multi-year corporate choices made with full knowledge of the consequences.

205. The payments made by Defendants to related parties constituted funds that should have been utilized to hire, train and retain sufficient numbers of qualified and competent staff to

32

meet the needs of and protect Nathalie Cooper and other residents at Facility and other skilled nursing facilities.

206. Defendants had the financial ability to provide sufficient staff, including registered nurses, to assure their residents' safety.

207. By each quarterly submission of the PBJ data described above, Defendants confirmed, in their own reporting and over their own signatures, that they were operating below the staffing levels associated with safe care, even when their HPPD is computed using the most generous methodology available.

208. Knowing that the Facility was chronically understaffed, Defendants nevertheless continued to admit and retain residents, including Mrs. Cooper and the Assailant, generating the per-resident-day revenue that Medicare, Medicaid, and private-pay sources provide.

209. Mrs. Cooper's own monthly cost rose during her residency from approximately $6,800 to approximately $9,100, with no commensurate improvement in the care she received.

210. Defendants chose to capture that revenue, and to escalate it, rather than to reduce census to a level the existing staff could safely supervise.

211. This undercapitalization and lack of sufficient staff directly resulted in Facility not providing the very basic and necessary services to prevent, among other things, resident injury, abuse and neglect, including Mrs. Cooper's rape and wrongful death.

212. Defendants' interference, domination, intervention, and direct participation in the operations of Facility were rooted in Defendants' knowledge that minute changes in the resident census/occupancy of the nursing home dramatically impacted Defendants' overall revenues.

213. Defendants also knew that control of staffing costs, the single largest expense to the nursing home business, was vital to protecting and increasing Defendants' profit margins.

214. Driven by the desire to grow revenues and increase profits, upon information and belief, Defendants:

   a. Tightly monitored and controlled the census/occupancy targets and levels in its nursing homes, including Facility, on a routine basis;

33

b. Established, monitored, and enforced census/occupancy, staffing and labor costs targets, including those for Facility, on a routine basis;

c. Closely monitored resident discharges, transfers, and the bed vacancies in their nursing homes, including Facility, on a habitual and frequent basis; and

d. Mandated that its nursing homes, including Facility, routinely report the following to Corporate Defendants:

    i. Compliance with and variance from Corporate Defendants' census/occupancy targets and objectives; and

    ii. Compliance and variance in staffing levels and labor costs the Corporate Defendants established and approved for the nursing homes.

215. Upon information and belief, Facility, by and through their employees and agents, acted in accordance with Defendants' required census/occupancy edicts, staffing and labor cost restrictions, marketing, admission, and discharge policies and procedures by filling empty beds, recruiting high acuity residents, and maintaining dictated occupancy and staffing levels inconsistent with the needs of residents, including Nathalie Cooper.

216. Defendants' policies and financial decisions caused a dangerous gap between the care that was required to meet the basic needs of residents and the care that could actually be provided by the limited staff and resources at Facility, resulting in the residents, including Nathalie Cooper, being placed at risk of serious injury, abuse and neglect.

217. Upon information and belief, the decisions made by Defendants led to significant and ongoing systemic failures to provide appropriate care at their facilities. Defendants had ongoing and systemic failures at multiple facilities, including Facility, to maintain procedures and monitor interventions to prevent harm at its facility. Defendants were on notice of these systemic failures but chose not to correct them, prior to the subject injury to Nathalie Cooper.

218. Despite their distinct knowledge of the risks of harm and the actual harm caused to residents by such conduct, Defendants' policies and practices, and their implementation of those policies and practices, deprived residents, including Nathalie Cooper, of adequate staffing and other resources necessary to meet their needs, including, but not limited to, appropriate plans of care, assessment and monitoring of their condition, adequate supervision

34

and monitoring of residents, adequate treatment and care, adequate training of staff, adequate supervision and oversight of staff, and a safe environment.

219. The control that Defendants exercised in this regard surpassed the control that is a normal incident of ownership of a subsidiary and was in disregard for the interests of Facility and the interests of the residents in the nursing home. Defendants' direct participation in the conduct at issue superseded their discretion regarding their subsidiaries, violated the law, and created the conditions leading to the acts and omissions complained of herein. The agents of Defendants who made decisions and took the actions complained of were acting in their capacity as agents, officers, and/or directors of Defendants.

220. Knowing that the Facility was chronically understaffed, Defendants nevertheless continued to admit and retain residents, including Mrs. Cooper and the Assailant, generating the per-resident-day revenue that Medicare, Medicaid, and private-pay sources provide. Mrs. Cooper's own monthly cost rose during her residency from approximately $6,800 to approximately $9,100, with no commensurate improvement in the care she received.

221. Defendants chose to capture that revenue, and to escalate it, rather than to reduce census to a level the existing staff could safely supervise.

222. Defendants chose to backfill the resulting staffing gap with related-party contract labor at agency rates rather than to invest in retention, recruitment, or competitive direct-employment wages.

223. Defendants chose to operate weekends without a Director of Nursing on premises, every single weekend in 2024, rather than to staff the Facility for genuine seven-day-a-week operation.

224. By structuring the operation of the Facility through the triple-net OpCo/PropCo arrangement, the related-party staffing contract, and the centralized management of Defendant Ascent Management, the Corporate Defendants ensured that the operating revenues of the Facility flowed upstream and outward to related parties controlled by the same corporate principals, rather than being reinvested into the direct-care nursing labor that residents like Mrs. Cooper required.

35

225. Instead of revenues being reinvested in care, it was extracted from the operation through related-party rent, related-party staffing fees, related-party management fees, and direct distributions.

226. Plaintiff further incorporates herein the catalogue of manipulative corporate conduct identified above, including but not limited to:

    a. the asset-light OpCo with $149,376 in fixed assets and $13.5 million in revenue;

    b. the appearance of approximately $37.9 million in new long-term liabilities on the 2024 cost report simultaneous with the CHOW;

    c. the MAC-disallowed related-party rent of $1.48 million (2022) and $2.37 million (2023);

    d. the thirteen-fold escalation of Daisy Staffing contract labor between 2022 and 2023;

    e. the outsourcing of all back-office functions to Apex/AXG/Global Healthcare Fiscal Services Group;

    f. the Denial of chain-home-office affiliation in the face of contemporaneous correspondence demonstrating Ascent Management's operational control;

    g. the simultaneous use of the predecessor and successor trade names after the CHOW;

    h. the Q3 2024 PBJ data gap; and

    i. the use of a single Brooklyn address by the ultimate beneficial owner, the holding company, and the operating company.

227. Defendants' conduct, taken as a whole, was not mere negligence. It was a conscious, intentional, and continuing course of conduct undertaken in disregard of and indifference to the rights and safety of the residents in Defendants' care, including Mrs. Cooper, which the Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm. Defendants' conduct was grossly negligent; it was willful and wanton; and it supports the imposition of punitive damages under North Carolina law.

## *E. Individual-Defendant Participation and Veil-Piercing*

228. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

229. Defendant Friedman personally and directly participated in the course of conduct giving rise to liability.

230. As reported on the CMS-855A, on the CMS-588, on the CMS-1561, on the CMS-671, on the HHS-690, on the NPI Registry, and on the North Carolina Articles of Organization for Hendersonville NC OPCO LLC, Friedman is simultaneously:

    a. the 100% indirect owner of Hendersonville Opco;

    b. the Corporate Director of Hendersonville Opco;

    c. the Authorized Official of Hendersonville Opco who certifies its federal Medicare enrollment;

    d. the Member and Organizer who signed the Articles of Organization on October 31, 2022; and

    e. the NPI-registered "COO" for the Facility.

231. Defendant Friedman also transacts the OpCo's federal regulatory business through an email account on the email domain of Defendant Ascent Management.

232. The combination of these roles, the use of a single mailing address for himself, Pisgah Holdco, and Hendersonville Opco, and the use of the management company's email domain establishes Friedman's direct dominion and control over the Facility Operator and supports veil-piercing as to Friedman personally and as to Defendants Hendersonville Opco and Pisgah Holdco.

233. Defendant Zanziper personally and directly participated in the course of conduct as authorized signatory for Accordius Hendersonville at the moment of CHOW.

234. The chronic understaffing pleaded above for 2023 (the year preceding the CHOW) occurred on Zanziper's watch as the authorized signatory of the predecessor operator. He executed the documents by which the predecessor operator purported to surrender its license and transfer the Facility, documents that do not appear to have affected the operational separation they purport to effect.

235. Zanziper's role supports veil-piercing as to Zanziper personally and as to Accordius Hendersonville and Accordius Health LLC.

236. Defendant Hyman, on information and belief, exercised dominion-and-control authority over the predecessor operator (Accordius Hendersonville), over Defendant Pisgah Holdco, and over Defendant Accordius Health LLC, including in respect of the formulation and approval of the Facility's admissions, staffing, and abuse-prevention policies during 2022 and 2023.

237. As individuals or entities acting as a single business enterprise, joint enterprise, joint venture, joint employer, and under successor-liability principles as pleaded herein (which is incorporated herein by reference), and by virtue of the Individual Defendants' personal participation in or condonation or ratification of the conduct pleaded throughout this Complaint, each Individual Defendant is jointly and severally liable for the acts and omissions of each Corporate Defendant under whose authority he acted, and each Corporate Defendant is jointly and severally liable for the acts and omissions of each other Corporate Defendant.

## VI. INDIRECT LIABILITY OF THE CORPORATE

## AND INDIVIDUAL DEFENDANTS

238. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

239. In addition to being directly liable for the wrongful acts and resulting damages detailed herein, the Corporate Defendants and Individual Defendants are also indirectly liable to Plaintiff pursuant to one or more of the following alternative legal theories. The factual predicates pleaded throughout this Complaint — including, without limitation, the seventeen-month Medicare EFT overlap, the shared Brooklyn and Englewood Cliffs addresses, the common principals across entities, the related-party rent disallowed by Medicare, the related-party staffing and management fees, the asset-light $149,376 OpCo against $13.5 million of revenue, the appearance of approximately $37.9 million in CHOW Debt, the false Section 7 denial of chain home office affiliation, and the simultaneous use of predecessor and successor trade names — are incorporated herein by reference.

38

## A. Alter Ego / Veil-Piercing Under the Instrumentality Rule.

240. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

241. Under North Carolina's instrumentality rule, the corporate form may be disregarded and individual and parent liability imposed where the plaintiff proves (i) complete domination of the corporation's finances, policy, and business practice in respect to the transaction attacked; (ii) use of that domination to perpetrate a violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's rights; and (iii) proximately resulting injury or unjust loss to the plaintiff. *Glenn v. Wagner*, 313 N.C. 450, 455–58 (1985); s*ee also Strawbridge v. Sugar Mountain Resort, Inc.*, 320 F. Supp. 2d 425, 430–32 (W.D.N.C. 2004) (applying *Glenn* factors).

242. At all material times, Defendant Hendersonville Opco was the subsidiary and alter ego of Defendants Pisgah Holdco, Ascent Management, and Defendant Friedman; Defendant Accordius Hendersonville was the subsidiary and alter ego of Defendants Accordius Health, NC M53, Portopiccolo, Hyman, and Zanziper; and Mountain Home PropCo was the alter ego of Defendants Friedman, Pisgah Holdco, and the Portopiccolo/Accordius enterprise.

243. Specifically, and in support of these alter ego allegations:

   a. The management and operations of Defendant Hendersonville Opco was so dominated, controlled, and assimilated within Defendants Pisgah Holdco, Ascent Management, and Defendant Friedman that Hendersonville Opco was organized and operated as a mere tool or instrumentality and was simply a conduit through which those Defendants conducted their business. Friedman simultaneously serves as the 100% indirect owner, Corporate Director, Chief Operations Officer, and Authorized Official of Hendersonville Opco; as the COO, Organizer, and Manager of Ascent Management; and as a Member of Pisgah Holdco — all of which share the same Brooklyn or Charlotte business addresses and email domains;

   b. The management and operations of Defendants Accordius Hendersonville, Accordius Health, NC M53, and Mountain Home were so dominated, controlled, and assimilated within Defendant Portopiccolo and within Defendants Hyman and Zanziper that those entities were organized and operated as mere tools or

39

instrumentalities and were simply conduits through which Defendants Portopiccolo, Hyman, and Zanziper conducted their business. Hyman is a Member of Accordius Hendersonville, a Manager of Accordius Health, a Member of Pisgah Holdco, a Member of Mountain Home, and upon information and belief of NC M53, and the co-founder and CEO of Portopiccolo. Zanziper is the "Senior Officer" of Accordius Hendersonville and the Co-Founder/President of Portopiccolo, and personally executed the CHOW transactional documents on behalf of Accordius Hendersonville;

c. All Corporate Defendants failed to follow corporate formalities, including by sharing common office addresses:

    i. 3512 Quentin Road, Brooklyn, NY 11234 for Friedman, Pisgah Holdco, Hendersonville Opco, Accordius Hendersonville, and Ascent Management, and

    ii. 980 Sylvan Avenue, Englewood Cliffs, NJ 07632 for Accordius Hendersonville, Accordius Health, Ascent Management, and Mountain Home PropCo;

    iii. 440 Sylvan Avenue, Suite 240, Englewood Cliffs, NJ 07632 for Simcha Hyman, Naftali Zanziper, Portopiccolo,

    iv. 6047 Tyvola Glen Circle, Charlotte, NC for Interstate Agent Services as registered agent for multiple entities), and

d. At all times relevant hereto, the Corporate Defendants shared common officers, directors, members, and managers, specifically including Defendants Friedman, Hyman, and Zanziper, and the Portopiccolo and Ascent Management chain executive teams.

e. Defendants shared back-office service vendors;

f. Accordius Hendersonville, Accordius Health, NC M53, Mountain Home, and Hendersonville Opco were sham corporations which, upon information and belief, were inadequately capitalized to provide protection for its frail elderly residents, including Mrs. Cooper. For instance, by the OpCo's own 2024 Medicare cost report, the OpCo held only $149,376 in total fixed assets against approximately $13.5 million in gross patient-service revenue (a ratio of roughly 1.1%) and had cash and

40

temporary investments of $89,900 — dangerously inadequate working capital for a 134-bed Medicare- and Medicaid-certified skilled nursing facility. Mrs. Cooper, and other similarly situated frail elderly residents, depended upon the OpCo to protect them from harm, which dependence was known and cultivated by the Corporate Defendants;

g. Defendants excessively fragmented its long term care business, including but not limited to the ways alleged throughout this Complaint;

h. The Defendants used their domination and control of Accordius Hendersonville, Accordius Health, NC M53, Mountain Home, and Hendersonville Opco to commit wrong and/or to perpetrate the violation of the positive legal duties enumerated throughout this Complaint, and/or to unjustly contravene Mrs. Cooper's legal rights to proper care by competent staff who were adequately screened for hire, trained, supervised, monitored, paid, and provided in sufficient numbers — diverting the resources necessary to provide such care upstream to themselves and their related-party affiliates for ultimate distribution to the Individual Defendants and other corporate principals.

i. The Defendants' exercise of control and breach of duty to Mrs. Cooper and other residents proximately caused the injuries Mrs. Cooper suffered, including her sexual assault, her undiagnosed and untreated femoral fracture, her conscious pain and suffering, and her death;

## B. Single Business Enterprise / Excessive Fragmentation.

244. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

245. In the further alternative, the Defendants are jointly and severally liable as a single business enterprise. Two or more nominally separate entities operate as a single business enterprise where they so unify their assets, operations, and management as to constitute a single economic enterprise, such that the liability of one is the liability of all. See, e.g., *Strawbridge,* 320 F. Supp. 2d at 432; *Edwards v. Northwestern Bank,* 39 N.C. App. 261 (1979).

41

246. The Defendants excessively fragmented their long-term-care business so as to insulate assets from tort liability and to shift operating revenues away from resident care, including in the following ways (which is not meant to be an exclusive listing):

   a. Mountain Home PropCo is the related-party owner and lessor of the real property at 200 Heritage Circle on which the Facility sits, and leases the property to Hendersonville Opco under a triple-net lease requiring above-market related-party rent (Medicare-disallowed in the amount of $1,480,000 in 2022 and $2,370,000 in 2023);

   b. Hendersonville Opco (and previously Accordius Hendersonville) is the asset-light licensee/operator that bears the day-to-day resident-care liability but holds only the bare-minimum tangible assets — operating with $89,900 in cash on $13.5 million in revenue;

   c. Ascent Management functions as the chain home office and receives centralized management fees while denying its chain-home-office affiliation on the Medicare Form 855A;

   d. Pisgah Holdco and NC M53 SPE Opco Holdco function as upstream holding-company "special purpose" shells that hold equity but no operating capacity;

   e. Daisy Staffing LLC functions as a related-party staffing agency receiving above-market contract-labor payments that escalated approximately thirteen-fold (from approximately $276,000 in 2022 to approximately $3,530,000 in 2023);

   f. Apex Global Solutions / AXG Solutions and Global Healthcare Fiscal Services Group LLC perform outsourced revenue-cycle management, billing, payroll, purchasing, IT, and other back-office functions, on information and belief under non-arm's-length terms; and

   g. On information and belief, the enterprise further utilizes a captive insurance vehicle and related pharmacy, durable-medical-equipment, and Medicare Part B billing affiliates of the kind characteristic of private-equity nursing-home chain structures, all of which extract revenue from the OpCo while leaving it judgment-proof.

42

247. This deliberate, multi-layered fragmentation, coupled with the asset-light OpCo, the related-party rent and staffing flows, the chain home office, and the appearance of approximately $37.9 million in new CHOW Debt simultaneous with the January 1, 2024 CHOW, evidences a single business enterprise in which the legal forms have been disregarded and resident-care obligations have been deliberately separated from the assets necessary to satisfy them.

## C. Agency.

248. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

249. At all times material to this Complaint, the Defendants acted as agents of one another, ratified or authorized the acts or omissions of one or more of the others, and possessed the right to control the actions of the others. The Individual Defendants acted as agents of the Corporate Defendants in approving and implementing the staffing, admissions, supervision, regulatory, and financial decisions that produced Mrs. Cooper's injuries; and the Corporate Defendants acted as agents of one another in implementing those decisions across the Facility. Each Defendant is therefore vicariously liable for the acts and omissions of every other Defendant under the agency doctrine.

## D. Joint Venture / Joint Enterprise.

250. To the extent the Defendants are found to be separate corporate entities, all Defendants remain liable for the acts and omissions of each other because they engaged in a joint venture and joint enterprise to own, operate, manage, and maintain the Facility. Specifically:

    a. The Corporate Defendants and the Individual Defendants had agreements with one another (including, without limitation, the triple-net lease between Mountain Home PropCo and Hendersonville Opco, the management-services arrangement with Ascent Management, the related-party staffing arrangement with Daisy Staffing, and the back-office services arrangements with Apex/AXG and Global Healthcare Fiscal Services Group) to carry out the common single business venture of owning, operating, managing, and maintaining the Facility and other long-term care facilities;

43

b. The Corporate Defendants and Individual Defendants combined their efforts, property, money, skill, and knowledge for the purpose of operating the Facility (and other long-term care facilities in their network); they jointly shared in the profits of the Facility's operations; and each had rights in some measure to direct the conduct of the others through a fiduciary or quasi-fiduciary relationship and a mutual right of control; and

c. The joint venture and joint enterprise renders each Defendant jointly and severally liable for the acts and omissions of every other Defendant committed in furtherance of the common enterprise, including the staffing, admissions, supervision, and financial decisions that resulted in Mrs. Cooper's injuries and death.

**E. Joint Employment.**

251. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

252. Upon information and belief and at all times material to this Complaint, the nursing, behavioral-health, custodial, and administrative employees and staff at the Facility were jointly employed by two or more of the Defendants, because the Defendants:

a. Shared or co-determined the essential terms and conditions of the employees' employment (including wages, hours, schedules, shift assignments, training requirements, and disciplinary standards), including through the chain-home-office functions of Ascent Management;

b. Jointly determined, shared, or allocated the power to direct, control, or supervise the employees, whether by direct or indirect means, including through the Facility-level Administrator and Director of Nursing reporting up to Ascent Management's Vice President of Operations and to Defendant Friedman;

c. Jointly determined, shared, or allocated the power to hire or fire the employees or to modify the terms or conditions of the employees' employment;

d. Through the shared management and/or direct or indirect ownership interests in one another, controlled, were controlled by, or were under common control with one another; and

44

e. Jointly determined, shared, or allocated responsibility over functions ordinarily carried out by an employer, including payroll, benefits administration, scheduling, training, and the engagement of contract and agency labor (including through Daisy Staffing).

253. Each Defendant is therefore liable as a joint employer for the negligent and grossly negligent acts and omissions of the Facility staff who provided (or failed to provide) care to Mrs. Cooper.

**F. Successor Liability — "Mere Continuation" and "Continuing Enterprise."**

254. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

255. The January 1, 2024 CHOW from Accordius Hendersonville to Hendersonville Opco was a paper restructuring, not an arm's-length sale, and the Successor Strand is liable for the obligations and liabilities of the Predecessor Strand under the "mere continuation" and "continuing enterprise" exceptions to the general rule of non-successor liability. Predicates satisfied here include:

a. The continuity of the physical plant, residents, employees, management personnel, operational policies, telephone number, fax number, NPI, Medicaid Provider Number, certified bed complement, and Facility license NH0382;

b. The express assumption by operation of 42 C.F.R. § 489.18(c) of the predecessor's CMS Provider Agreement obligations and liabilities, including all prior deficiencies, plans of correction, prior survey findings, and enforcement remedies;

c. The common natural-person principal Defendant Friedman, whose continuous personal involvement before, during, and after the CHOW — evidenced by his electronic receipt of regulatory correspondence first at the @theportopiccologroup.com email domain (2022) and then at the @ascenthcmgmt.com email domain (2024) — confirms that the successor is a mere continuation of the predecessor under unchanged ultimate control;

d. The seventeen-month Medicare EFT overlap during which the successor's Medicare reimbursements continued to be deposited into the predecessor's bank account, in

violation of 42 C.F.R. § 424.510(d)(2) and as direct documentary evidence of commingled funds and disregard of corporate formalities;

e. The absence of any arm's-length valuation, true third-party purchase, or arm's-length intercompany consideration; and

f. The simultaneous use of the predecessor and successor trade names months after the purported CHOW, including the Facility's August 7, 2024 reference to itself as "Orchard Valley Health and Rehabilitation a (Accordius Health at Hendersonville)" in regulatory correspondence.

256. Defendant Hendersonville Opco and the other Successor Strand Defendants are therefore liable for the acts, omissions, and obligations of Defendant Accordius Hendersonville and the other Predecessor Strand Defendants on the foregoing successor-liability theories.

## G. Respondeat Superior.

257. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

258. Independent of and in addition to the foregoing indirect-liability theories, each Defendant is vicariously liable under the doctrine of respondeat superior for the negligent, grossly negligent, willful and wanton acts and omissions of its employees, agents, joint employees, apparent agents, officers, directors, and managers, (including, without limitation, the Administrator, Director of Nursing, charge nurses, certified nursing assistants, contract and agency nursing staff, and the medical director and attending physicians who acted at the Facility's direction or under its supervision, contracted Hopsice providers), committed within the course and scope of such employment or agency, and for the benefit of the Corporate Defendants.

## VII. Purpose of the Governing Law

259. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

260. The federal government enacted the Omnibus Budget Reconciliation Act of 1987 ("OBRA '87"), codified at 42 C.F.R. § 483 et seq., in direct response to growing concerns about substandard care and inadequate protections for nursing home residents.

46

261. The purpose of OBRA '87 was to improve quality of care and protect the rights of residents in nursing homes that receive Medicare and Medicaid funding.

262. Likewise, when North Carolina's General Assembly enacted a statutory scheme for regulating skilled nursing facilities, it intended to ensure that skilled nursing facilities provide services that assist residents in such a way as to ensure quality of life and maximum flexibility in meeting individual needs and preserving individual autonomy.

263. Every resident of a skilled nursing facility in North Carolina has the right to:

    a. be treated with respect, consideration, dignity, and full recognition of his or her individuality and right to privacy;

    b. to receive care and services which are adequate, appropriate, and in compliance with relevant federal and State laws and rules and regulations; and

    c. to be free of mental and physical abuse, neglect, and exploitation.

264. The laws, rules, and regulations governing skilled nursing facilities were enacted to keep residents safe from preventable harm.

265. The federal government recognizes the need to ensure that nursing homes are adequately staffed in order to assure resident safety and requires that nursing homes "provide services by sufficient staff to assure resident safety . . . ." 42 C.F.R. § 483.35(a).

## VIII. FACTUAL ALLEGATIONS REGARDING MRS. COOPER

### A. Mrs. Cooper, the Decedent

266. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

267. Nathalie Cooper was born on November 12, 1923, and was 100 years old on June 12, 2024, and at the time of her death on June 15, 2024.

268. From 1943 through 1946, Mrs. Cooper served her country as a member of the United States Navy WAVES (Women Accepted for Volunteer Emergency Service), a uniformed branch of the United States Naval Reserve, during the Second World War.

47

269. Mrs. Cooper was, throughout her adult life, an accomplished artist. Her work included a self-portrait and a portrait of the Reverend Dr. Martin Luther King, Jr., and is the subject of public reproductions in the possession of her family.

## B. Admission and Baseline Care Needs

270. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

271. Mrs. Cooper was admitted to the Facility on March 21, 2022, with a primary diagnosis of unspecified dementia and additional diagnoses including Alzheimer's disease, generalized muscle weakness, need for assistance with personal care, and abnormalities of gait and mobility.

272. Her husband chose to place her at the Facility for two primary reasons:

    a. it was within walking distance of his home, allowing him to visit her frequently; and

    b. the Facility promised to provide his wife with proper care and supervision, including therapy, which he wanted in order to maintain her strength and well-being.

273. At the time of her admission and at all times thereafter, Mrs. Cooper was dependent on Facility staff for activities of daily living, including transfers, ambulation, toileting, repositioning, hygiene, and feeding.

274. Mr. Cooper placed full trust in the Facility to keep his wife safe, care for her, and provide adequate supervision to keep her safe from neglect and abuse.

275. From the time of admission, Mrs. Cooper was repeatedly assessed as a high-risk patient under the Facility's own clinical risk-assessment tools, including Braden Scale scores in the high-risk range for the development of pressure injuries, and Morse Fall Scale scores up to 95, well above the threshold defining high fall risk.

276. Mrs. Cooper was a private-pay resident of the Facility. Her monthly room-and-care rate increased from approximately $6,800 per month at the time of her admission to

48

approximately $9,100 per month by the spring of 2024, an increase in excess of thirty percent.

### C. Mrs. Cooper's Injuries and Other Concerns at the Facility

277. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

278. Defendants chose to place Mrs. Cooper in a room that was far from the nursing station, and thus not easily visible to the nursing staff, making supervision of her and anyone entering her room difficult.

279. Mrs. Cooper's husband, Mr. Cooper, expressed concern regarding the location of her room and the lack of adequate supervision. That concern was ignored.

280. During Mrs. Cooper's residency, her husband was concerned because male residents were allowed to enter his wife's room, unsupervised. Mr. Cooper brought this concern to the attention of the Facility staff and management. Facility staff and management repeatedly re-assured Mr. Cooper that there was nothing to be worried about, and took no actions to prevent male residents from entering Mrs. Cooper's room nor to increase her supervision.

281. During Mrs. Cooper's residency, her personal belongings were lost, stolen or otherwise misplaced, including her hearing aids, glasses, and clothing. Facility staff and management had no explanation or cure for this, despite Mr. Cooper's complaints.

282. During Mrs. Cooper's residency, her physical therapy was abruptly stopped, without explanation to her husband, Mr. Cooper.

283. During Mrs. Cooper's residency, her husband frequently experienced a lack of available caregivers, oftentimes having to wait long periods of time for someone to respond to his calls for assistance for his wife.

284. During Mrs. Cooper's residency, she sustained multiple falls, including on:

    a. July 15, 2022,

    b. February 21, 2023, resulting in a large hematoma to her forehead;

    c. March 12, 2023,

49

d. November 13, 2023, and

e. February 8, 2024.

285. The Facility was supposed to have fall mats beside Mrs. Cooper's bed to reduce the risk of injuries from a fall, but Mr. Cooper frequently found these pushed under her bed or otherwise not in place.

286. The Facility was supposed to place her bed in the low position when they were not providing care to her, in order to minimize risk of injury to her from falls, but Mr. Cooper frequently found the bed in the high position.

287. Mr. Cooper frequently voiced his concerns regarding his wife's care with Facility staff, including concerns over the males entering her room unsupervised, the loss of her personal items, the abrupt cessation of therapy, the falls mats not being in place, and the bed not being lowered, her not receiving adequate dental care, leaving dirty clothes in her room and closet. Those complaints went unanswered by Facility staff and management.

288. On May 18, 2024, Mrs. Cooper sustained a major fall at the Facility, striking her head and sustaining a laceration that required seven staples to close. She was transported to an emergency department, evaluated for a head injury, and returned to the Facility. Her hips and extremities were not imaged at that time.

**D. The Missed Femoral Fracture, May 21 – June 12, 2024**

289. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

290. On May 21, 2024, Mrs. Cooper was evaluated by a physical therapist, who determined that she was having pain in her right hip. The therapist reported her complaints of pain to Facility nursing.

291. On May 21, 2024, in response to a report of her right hip pain, the Facility failed to document, failed to assess the cause or source of her pain, failed to notify her physician, and failed to notify her responsible party.

292. On May 24, 2024, Mrs. Cooper was injured when Facility staff were transferring her from her bed to the wheelchair. She sustained large skin tears to both legs during the transfer.

50

293. On June 2, 2024, in response to lower-extremity pain complaints, the Facility ordered and obtained an x-ray of Mrs. Cooper's ankle only. The ankle x-ray was negative.

294. From June 3 through June 4, 2024, Mrs. Cooper experienced a marked decline in condition, including increased lethargy, decreased oral intake, increased agitation, and inability to bear weight, all of which were documented contemporaneously in the Facility's nursing notes.

295. No imaging of the hip, pelvis, or femur was ordered or performed at any time after her May 18, 2024 fall, notwithstanding her recent fall and the elementary differential-diagnosis requirement to image the proximal joint when distal imaging is negative in a high-fall-risk patient with new-onset lower-extremity pain.

296. On June 5, 2024, hospice services were recommended for Mrs. Cooper. On the same date, certified nursing assistants providing direct care reported to charge nursing personnel and to the Director of Nursing that Mrs. Cooper appeared to have a fractured hip, based on the position of her leg, the swelling, the pain on contact, and her inability to bear weight.

297. From June 5, 2024 and thereafter, Mrs. Cooper became essentially bedbound, as the staff was unable to get her out of the bed, and she developed difficulty with eating. This was a significant change in her condition. No assessment was conducted to determine why she experienced this sudden and significant change in her condition. Instead, she was simply placed on Hospice.

298. On June 6, 2024, Mrs. Cooper winced in pain when staff moved her right leg.

299. The Facility still did not order imaging, did not request orthopedic evaluation, and did not transport Mrs. Cooper to a hospital. Rather than work up the cause, the Facility, through its hospice provider, began administering Morphine and Ativan to Mrs. Cooper.

300. On June 11, 2024, at approximately 6:26 a.m., a Facility nurse — who, upon information and belief, had been out of work on leave for at least the prior week — noticed that Mrs. Cooper's right leg was shorter than her left and turned inward.

301. On June 11, 2024, at 3:33 p.m., the Director of Nursing requested an x-ray of Mrs. Cooper's hip, as she suspected a fractured hip. At that time, she reported that Mrs. Cooper

had had a fall one week prior to that date. Said fall was not documented in the Facility records.

302. On June 12, 2024, at 12:39 a.m., an x-ray was taken of Mrs. Cooper's right hip. It revealed a comminuted right-sided intertrochanteric fracture.

303. The interval between the May 18, 2024 major fall and the midnight June 11–12, 2024 confirmation of the femoral fracture was approximately twenty-five days. During that twenty-five-day interval, the Facility failed:

    a. to image the hip after the May 18 fall;

    b. to image the hip after she reported hip pain on May 21;

    c. to image the hip after the June 2 ankle x-ray returned negative;

    d. to act upon the contemporaneous June 5 staff report that Mrs. Cooper appeared to have a hip fracture; and

    e. to work up the source of the June 6 pain before commencing opioid and benzodiazepine administration.

**E. The Sexual Assault of June 12, 2024**

304. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

305. Just nine days prior to June 12, 2024, the Facility admitted Alan Greene (the "Assailant"), a male resident in his forties who had serious mental illness and had been incarcerated for approximately five years for multiple felony convictions. The assailant's last incarceration ended less than three months before his admission.

306. In the nine days prior to the Assault, other staff observed the Assailant "lurking" around other female residents' rooms, and roaming about the facility. Nursing staff would tell the Assailant to return to his room, but he continued to roam freely about the facility.

307. On the very day of the Assault, the Assailant exposed himself to and masturbated in front of female Facility staff. That conduct was reported up to the Director of Nursing.

308. The Director of Nursing dismissed the report with words to the effect of "Well, it's his right" and took no protective action. The Facility:

   a. Did not isolate the Assailant from female residents;

   b. did not initiate one-on-one supervision;

   c. did not implement enhanced 15-minute checks;

   d. did not initiate a behavioral care plan;

   e. did not request a psychiatric consultation; and

   f. did not report the conduct to law enforcement or to NCDHHS DHSR.

309. At approximately 1 a.m. on June 12, 2024 — within minutes of the midnight confirmation of Mrs. Cooper's femoral fracture — a Facility nurse heard a sound coming from Mrs. Cooper's bed.

310. Upon entering Mrs. Cooper's room, the nurse found the Assailant in the bed behind Mrs. Cooper's person. On information and belief, the Assailant was at that time engaged in the sexual assault of Mrs. Cooper.

311. The Assailant was lying in the bed directly behind Mrs. Cooper, with both of their pants pulled down, and her breasts exposed. Blood and stool were found in her bed.

312. Mrs. Cooper, at that moment, was a 100-year-old totally dependent resident with a freshly confirmed femoral fracture, immobile, non-ambulatory, and lacking the ability to protect or defend herself, and lacking the cognitive and physical capacity to consent to, resist, or report the assault.

**F. Mission Hospital SANE Examination Findings**

313. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

314. Following the assault, Mrs. Cooper was transported to Mission Hospital, Asheville, North Carolina, where she was examined by a Sexual Assault Nurse Examiner (SANE). The SANE examination documented, among other findings, a tear of the perianal region and bruising in the perianal region.

53

315. Mission Hospital reported the assault to local law enforcement.

316. Mrs. Cooper never returned to her prior level of awareness or consciousness after she was raped. She went into a state of shock due to the psychological and physiological stress, from which she never recovered.

317. Three days later, on June 15, 2024, Mrs. Cooper passed.

## IX. FORESEEABLE INJURY and DEATH:

## DEFENDANTS' PATTERN AND PRACTICE OF NEGLECT

### 1. Defendants on notice of multi-year history of dangerous care.

318. The preceding numbered paragraphs are incorporated herein by reference as if fully set forth herein word for word.

319. The harms suffered by Mrs. Cooper, including her fractured femur, her rape, and her death, did not arise out of a single isolated lapse. They were the foreseeable product of a years-long pattern of regulatory deficiencies at the Facility known, or which reasonably should have been known, to each Defendant prior to June 12, 2024, and that they did not abate.

320. The regulatory record summarized below is incorporated as direct, contemporaneous evidence of notice; foreseeability; corporate-level participation in and condonation of the conditions producing Mrs. Cooper's sexual assault and death; and the systemic, as opposed to isolated, character of Defendants' conduct.

321. At all relevant times, the Facility operated under a single North Carolina state license, NH0382, and under a single CMS CCN, 345285 (also reported as 34-5285 in CMS Atlanta correspondence). That license and CCN were never surrendered, suspended, terminated, or reissued under a new number during the relevant period, notwithstanding repeated changes in tradename and operating-entity identification.

322. Upon information and belief, Defendants, including Friedman, received electronic notice of a pattern and practice of unsafe and dangerous care at the Facility, resulting in NC DHHS findings of deficiencies in care, including the following.

323. On July 23, 2021, NC DHHS DHSR issued a Statement of Deficiency finding failures to ensure accurate MDS assessments, coordinate pre-admission assessments for residents with mental illness, implement appropriate care plans.

324. On August 13, 2021, NC DHHS DHSR issued a Statement of Deficiency after finding maggots in a resident's tracheostomy.

325. Beginning on or about January 11, 2022, NCDHHS Health Care Personnel Investigations opened HCPI Investigation NA-01-0050-22 concerning an allegation of health-care-personnel misconduct at the Facility.

326. Beginning January 27, 2022, NCDHHS Nurse Consultant II Kim Blaisdell Sims conducted an Extended Survey for Immediate Jeopardy at the Facility.

327. NCDHHS DHSR Branch Manager Karen Roquemore issued Corrective Action Plan correspondence on January 20, 2022, regarding F-925.

328. On February 11, 2022, NC DHHS DHSR issued a Statement of Deficiency finding the facility in Immediate Jeopardy for allowing a cognitively impaired resident to elope, finding they failed to ensure the environment was free of accident hazards,

329. Between July 5–11, 2022, NCDHHS DHSR Western Regional Office conducted a Recertification and Complaint Investigation Survey (Event ID YLN811).

330. The resulting Statement of Deficiencies, posted to the CMS ASPEN ePOC website on July 25, 2022 with the Facility's Plan of Correction due August 4, 2022, resulted in eleven (11) federal F-tag citations, including

    a. F-636 (Comprehensive Assessments and Timing):

    b. F-637 (Comprehensive Assessment After Significant Change);

    c. F-640 (Encoding and Transmitting Resident Assessments);

    d. F-641 (Accuracy of Assessments);

    e. F-684 (Quality of Care); F-756 (Drug Regimen Review);

    f. F-757 (Drug Regimen Free from Unnecessary Drugs);

    g. F-812 (Food Procurement, Store/Prepare/Serve); F-842 (Resident Records);

    h.  F-880 (Infection Prevention and Control); and

    i.  F-883 (Influenza and Pneumococcal Immunizations).

331.    The CMS ASPEN ePOC electronic distribution list for the July 2022 YLN811 SOD included, among others:

    a.   ifriedman@theportopiccologroup.com (Friedman);

    b.   other Portopiccolo personnel including jpierce@theportopiccologroup.com and tmasden@theportopiccologroup.com; and

    c.   Accordius operator personnel including rsmithey@accordiushealth.com, ckirby@accordiuahealth.com, and sflathmann@accordiushealth.com.

332.    This distribution list constitutes direct, contemporaneous, electronic notice to Friedman, eighteen months before the CHOW and twenty-three months before Mrs. Cooper's death, of facility-level F-tag deficiencies in resident assessment, quality of care, pharmacy, sanitation, infection control, and resident records.

333.    F-636, F-637, F-640, and F-641 are the same assessment-and-MDS family of citations implicated by Defendants' failure to recognize, assess, image, and treat Mrs. Cooper's lower-extremity pain and femoral fracture during the week preceding June 12, 2024.

334.    F-684 is the same quality-of-care failure mode that produced both the missed fracture and the unsupervised admission of the Assailant.

335.    The 2022 SOD therefore provided Defendants, including Defendant Friedman, with prior, written notice that this Facility was operating below applicable assessment, care-planning, and quality-of-care standards and that those failure modes were facility-wide and structural rather than isolated.

336.    On August 11–12, 2022, NCDHHS DHSR Branch Manager Karen Roquemore issued high-importance correspondence to Administrator Huck rejecting the Facility's submitted Plan of Correction for F-880 because the POC failed to include a facility-specific Legionella and waterborne-pathogen risk assessment and failed to implement an ASHRAE-compliant water-management program.

337. Between October 11–20, 2022, NCDHHS DHSR conducted a Recertification, Complaint Investigation, and Revisit Survey (Event ID YLN812), resulting in the Facility's second Immediate Jeopardy of the year (on October 17 – 18, 2022) after a cognitively impaired resident eloped through the front door and was found wandering along a 2-lane highway 8 miles away, and another resident sustained injuries after sliding out of her wheelchair during transport because staff failed to properly secure her lap belt.

338. On May 23, 2023, June 15, 2023, November 6, 2023, and April 15, 2024, NC DHHS DHSR issued Statements of Deficiency finding repeated failures to properly report COVID-19.

339. On October 13, 2023, the Facility received an F-760 tag citation for failing to administer critical medications to a resident, which the Unit Manager attributed directly to staffing issues; an F-677 citation for failure to ensure residents received necessary services to maintain good nutrition, grooming and personal hygiene; an F-755 citation for failure to ensure residents received all medications without interruption; an F-791 citation for failure to provide routine and emergency dental care; and an F-867 citation for failure to establish and implement written policies and procedures for feedback, data collection, and adverse event monitoring as part of its QAPI program.

340. Upon information and belief, Defendants received direct notice of all Statements of Deficiencies, which was direct evidence that the Facility was operating below applicable assessment, care-planning, and quality-of-care standards and that those failure modes were facility-wide and structural rather than isolated.

341. Despite said notice, Defendants failed to take proper correction actions to improve the care provided to its residents.

### 2. The June 18, 2024 F-600 AOC tied to the Cooper assault.

342. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

343. Federal F-tag F-600 enforces the resident's right to be free from abuse, neglect, exploitation, misappropriation of property, and corporal punishment, under 42 C.F.R. § 483.12.

57

344. On June 18, 2024 at 11:43 a.m., six days after the Cooper assault, NCDHHS Facility Compliance Consultant Penny Ramsey emailed Administrator Hardin and Ascent Management's VP of Operations Kimberly Smith, subject line "F 600 AOC," attaching the document "F600 AOC.Orchard.6.12.24.docx."

345. The attachment filename embeds the date of the Cooper assault within the title of the Facility's own contemporaneous Allegation of Compliance for the federal abuse citation.

346. The June 18, 2024 F-600 AOC correspondence is direct evidence that Defendant Ascent Management, through Kimberly Smith, was an active and material participant in the facility-level response to the federal abuse citation that the Facility itself associated with the Cooper assault date — materially inconsistent with any contention that Ascent Management was not exercising direct operational control over the Facility on and around June 12, 2024.

### 3. HCPI investigations during and after the Cooper period.

347. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

348. From January 7, 2022 to June 11, 2024, the Facility submitted at least forty-four reports of alleged resident abuse or neglect to NCDHHS Health Care Personnel Investigations department.

349. NCDHHS Health Care Personnel Investigations ("HCPI") reports submitted by the Facility during the June–October 2024 window were investigated by NCDHHS Nurse Consultant I Ashley N. Johnson, RN, BSN, MBA, Western Region.

350. During that window NCDHHS acknowledged at least the following HCPI matters at the Facility:

    a. NA-06-0067-24 (acknowledged June 11, 2024 — the day before the Cooper assault). This was an instance of staff-on-resident abuse that was also reported to law enforcement;

    b. NA-06-0145-24 (acknowledged June 18, 2024);

    c. NA-06-0375-24 (acknowledged July 3, 2024);

58

    d.  NA-07-0295-24, NA-07-0302-24, and NA-07-0303-24 (filed July 31, 2024 within a single fifteen-minute interval beginning at 9:38 a.m.); and

    e.  an unnumbered abuse allegation dated September 4, 2024.

351. The acknowledgment of HCPI NA-06-0067-24 on June 11, 2024 — the day immediately preceding the Cooper assault — establishes that the Facility was, on the eve of Mrs. Cooper's assault, an active subject of state regulatory investigation for abuse.

352. On September 12, 2024, NCDHHS DHSR Complaint Intake Unit Nurse Consultant II Faith Scott, RN, issued a non-receipt notice to the Facility documenting that an Investigation Report for the unnumbered September 4, 2024 abuse allegation had not been received within the same five-day reporting requirement — direct evidence of continuing facility-level failure to comply with the State's statutory five-day abuse-reporting requirement three months after the Cooper assault.

### 4. The June 21, 2024 survey, the federal CMP imposed nine days after the Cooper assault, and the amended enforcement letter.

353. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

354. On June 21, 2024, nine days after the assault on Mrs. Cooper, CMS imposed a federal civil monetary penalty of $16,452 against the Facility.

355. The existence of the June 21, 2024 survey is confirmed by NCDHHS correspondence requesting the physician's name and address for the survey "closed on 06/21/2024."

356. On information and belief, the survey of June 21, 2024 and the corresponding federal CMP are tied to the Cooper assault, to the F-600 AOC dated 6.12.24, or both.

357. On July 8, 2024, NCDHHS Assistant Section Chief Beverly Speroff, RD, LDN emailed Administrator Hardin advising that the survey enforcement letter had been amended to remove the remedies of discretionary denial of payment of new admissions and mandatory termination, leaving only a civil money penalty recommendation.

59

358. The state-level consideration of mandatory termination so close in time to the Cooper assault is independent corroboration that the conditions on June 12, 2024 were objectively dangerous and warranted the most severe enforcement remedy available under federal law.

**5. *The December 11, 2024 CMS CMP Due Notice transmitted to Defendant Friedman at the Ascent Healthcare Management domain.***

359. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

360. On December 11, 2024, CMS issued a federal CMP Due Notice for the Facility, denominated "Accordius Health at Hendersonville (34-5285)."

361. The CMP Due Notice was transmitted both to Administrator Hardin and directly to Friedman at israel@ascenthcmgmt.com. Administrator Hardin replied "Confirmed."

362. The December 11, 2024 CMP Due Notice is direct evidence:

    a. that the ultimate beneficial owner of record, Defendant Friedman, personally received contemporaneous notice of federal enforcement action against the Facility post-CHOW;

    b. that Defendant Friedman's active and operational email at the Ascent Healthcare Management chain home office domain is the address at which the federal regulator transmits enforcement correspondence to him in his capacity as owner; and

    c. that Defendant Friedman exercised dominion and control over the operating enterprise from the chain home office, materially inconsistent with any denial of chain-home-office control.

**6. *The December 6, 2024 standard survey documented 28 health citations, approximately five times the state average.***

363. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

60

364. On December 6, 2024, CMS and NCDHHS conducted the standard recertification survey of the Facility. The resulting Statement of Deficiencies (CMS Form 2567) cited twenty-eight (28) federal health-deficiency F-tags and fifteen (15) federal Life Safety F-tags.

365. Over the three years preceding the December 6, 2024 survey, the Facility accumulated approximately 98 complaint citations.

366. On information and belief, the December 6, 2024 Form 2567 cites, among others, F-553, F-558, F-578, F-580, F-584, F-607 (Develop and Implement Abuse Policies), F-623, F-636, F-638, F-640, F-644 (PASRR Coordination), F-660, F-680, F-684 (Quality of Care), F-689 (Free of Accident Hazards), F-690, F-712 (4 of 4 sampled residents missed required physician visits), F-755, F-760, F-770 (five missed medication doses), F-803, F-806, F-808, F-812, F-842, and F-914.

367. Three of the December 6, 2024 F-tag citations are of particular significance to the Cooper allegations:

   a. F-607 (Develop and Implement Abuse Policies) documents that on April 6, 2024, approximately two months before the Cooper assault, a male resident of the Facility entered Resident #11's room overnight, touched her thighs, and woke her, and that the nurse on shift did not timely report the incident, in violation of Facility abuse-reporting policy. F-607 establishes prior, written, regulatory notice to Defendants that the Facility's overnight abuse-reporting protocol was failing two months before the Cooper assault, and that the conditions producing the April 6, 2024, incident were not corrected before June 12, 2024.

   b. F-644 (PASRR Coordination) documents that the Facility admitted a resident (Resident #104) on June 6, 2024, six days before the assault on Mrs. Cooper, notwithstanding diagnoses of schizoaffective disorder and/or schizophrenia, major depression, and post-traumatic stress disorder; that the required Level II Pre-Admission Screening and Resident Review did not occur; and that the mental-health diagnoses were not addressed in Resident #104's care plan. F-644 independently establishes the failure of the pre-admission and care-planning safeguards intended to identify and contain the foreseeable risk that the Assailant's admission posed to other residents.

   c. F-689 (Free of Accident Hazards) documents that an agency CNA performed a mechanical-lift transfer using one person rather than the required two-person protocol, having received no Facility orientation — the same agency-staffing-

without-orientation failure mode that, on information and belief, characterized the overnight shift on June 11–12, 2024.

368. The pattern reflected by the December 6, 2024, Statement of Deficiencies, breakdowns across MDS and care planning, abuse reporting, medication and pharmacy administration, physician oversight, accident hazards, and quality of care, corroborates Plaintiff's allegation of systemic administrative collapse at the Facility on and before June 12, 2024.

### 7. Publicly reported quality measures corroborate the care failures.

369. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

370. Per the publicly available CMS Care Compare quality-measure dataset, the Facility was rated one (1) star, "Much Below Average," on its overall five-star rating, one (1) star on health inspection, two (2) stars on staffing, and one (1) star on overall quality measures. The Facility's case-mix-adjusted rate of long-stay residents experiencing falls with major injury is approximately 3.7%, against a national average of approximately 0.77% — approximately 4.8 times the national average. The case-mix-adjusted falls-with-major-injury rate independently corroborates Plaintiff's allegation that Defendants' facility-level care environment was not capable of safely supervising fall-risk long-stay residents like Mrs. Cooper, and that the failure to timely image and treat her femoral fracture between approximately May 21, 2024 and June 11, 2024, was part of a documented pattern rather than an isolated event.

## X. COMPLIANCE WITH RULE 9(j)

371. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

372. Plaintiff and his Counsel object to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this Rule seems to require Plaintiff to prove his case before factual discovery is even begun. This Rule denies medical malpractice plaintiffs their rights of due process of law, equal protection under the law, the right to open courts, and the right to a jury trial (in violation of the United States and North Carolina Constitutions), and that Rule

9(j) is an unconstitutional violation of Amendments VII and XIV of the United States Constitution, and Article I, Sections 18, 19 and 25 of the North Carolina Constitution.

373. Without waiving these objections, Plaintiff's counsel provides the following information to comply with the requirements of Rule 9(j): The medical care and all medical records pertaining to the alleged negligence of Defendants that are available to Plaintiff after reasonable inquiry, have been reviewed by persons who are reasonably expected to qualify as expert witnesses under Rule 702 of the Rules of Evidence, and who are willing to testify that the medical care provided by Defendants did not comply with the applicable standard(s) of care.

374. If the Court later determines that Plaintiff's Rule 9(j) experts do not meet the requirements of Rule 702(b) or 702(c), Plaintiff will move to qualify them as expert witnesses under Rule 702(e) of the Rules of Evidence. Plaintiff hereby moves the Court, pursuant to Rule 9(j)(2), to so qualify that person(s).

## XI. FIRST CLAIM FOR RELIEF: MEDICAL NEGLIGENCE

### A. DUTIES OF DEFENDANTS

375. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

376. At all times during Mrs. Cooper' residency, Defendants operated Facility as a skilled nursing facility within the meaning of N.C. Gen. Stat. §131E-101 offering skilled nursing care.

377. At all times relevant hereto, Defendants owed Mrs. Cooper a duty to comply with all regulations applicable to skilled nursing facilities, including N.C.G.S. Chapter 131E-100 *et. seq.*, and the state regulations adopted and promulgated thereunder 10A NCAC 13D, and the federal regulations contained in 42 C.F.R. Part 483.

378. At all times relevant hereto, all defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility.

379. Defendants owed Nathalie Cooper the duty to exercise direct management control of Facility on a full-time basis, to develop and implement policies for the management and operation of the facility, to train employees concerning those policies and their job duties, and

63

specifically to ensure that the duties outlined in the paragraphs below were met by their employees and/or agents.

380. These duties required the defendants to ensure there were sufficient and qualified staff at Facility to ensure the proper care for, and safety of, all residents including Nathalie Cooper.

381. These duties also required defendants to ensure that the staff were properly trained and supervised to ensure the proper care for, and safety of, all residents including Nathalie Cooper.

382. During Mrs. Cooper' admission to Facility, it was well known to the defendants' employees and agents that Nathalie Cooper was an elderly person who was dependent upon the defendants, their employees and/or agents for basic care and treatment needs.

383. Defendants, by and through their employees and agents, promised to provide Nathalie Cooper with such care as her condition reasonably required.

384. Moreover, as a nursing home resident, Nathalie Cooper had the right to receive the basic and minimum care prescribed by state and federal law.

385. Defendants were, at all relevant times, legally responsible for the actions of their officers, directors, managers, employees and agents, while acting within the course and scope of their employment and/or agency, pursuant to the doctrines of *respondeat superior* and agency.

386. At all times material to this complaint, the Defendants were "health care providers" as defined in N.C. Gen. Stat. § 90-21.11 and, as health care providers, owed Nathalie Cooper, while she was a resident at Facility the following duties:

    a. To use reasonable care and diligence in the application of their knowledge and skill to her care;

    b. To use their best judgment in her treatment and care and the treatment and care of their residents; and

    c. To provide Nathalie Cooper, and other residents, with treatment and care in accordance with the standards of practice among members of the nursing home profession and other medical support professions with similar training and experience situated in Henderson County, Hendersonville, North Carolina and/or similar communities, in the following ways:

64

i. To monitor and oversee the treatment which was prescribed and administered to her by nursing staff and other health care providers practicing at Facility;

ii. To monitor and oversee the qualifications, competency, and compliance with their policies and the applicable standards of care of the nursing staff and other health care providers practicing at Facility;

iii. To monitor and oversee the selection and retention of nurses, nursing assistants, and other health care providers practicing at Facility;

iv. To monitor and oversee the compliance of all employees and agents with safety standards the defendants voluntarily agreed to abide by, including N.C. Gen. Stat Chapter 131E, 10A N.C.A.C. 13D, and 42 CFR Part 483;

v. To properly supervise their employees and agents in the performance of their duties;

vi. To provide proper oversight of Mrs. Cooper's care, and the care of other residents, by a registered nurse;

vii. To ensure proper training of all staff, including contracted agency personnel, on Facility policies including abuse prevention, as required by 42 C.F.R. § 483.95 (Training Requirements);

viii. To adopt and implement policies which did not interfere with the best judgment of nursing staff and other health care professionals practicing at Facility;

ix. To adopt and implement policies which did not require the nursing staff and other health care professionals practicing at Facility to exceed their scope of practice or their duties to residents;

x. To ensure that documentation in Nathalie Cooper' medical record was accurate and reliable;

xi. To promote care for Nathalie Cooper in a manner and in an environment that maintained or enhanced her dignity and respect in full recognition of her individuality;

xii. To ensure she was free from abuse, including resident-on-resident abuse, as required by 42 C.F.R. § 483.12 (Freedom from Abuse, Neglect, and

65

Exploitation) and the duty to develop and implement policies prohibiting and preventing such abuse;

xiii. To ensure that they provided those goods and services necessary to avoid physical harm and mental anguish to Mrs. Cooper;

xiv. To ensure adequate supervision and assistance to prevent resident-on-resident abuse;

xv. To ensure adequate supervision and assistance devices to prevent accidents, as required by 42 C.F.R. § 483.25(d) (Quality of Care, Accidents);

xvi. To ensure pre-admission identification of residents with serious mental illness and tailoring of admission and supervision conditions accordingly, as required by 42 C.F.R. §§ 483.20(k) and 483.130 et seq. (PASRR Level II screening);

xvii. To ensure care was provided in accordance with 10A N.C.A.C. 13D (state licensure of nursing homes);

xviii. To ensure care was provided in accordance with N.C. Gen. Stat. § 131E-117 (Nursing Home Residents' Bill of Rights).

xix. To timely update resident care plans following changes in condition, as required by 42 C.F.R. § 483.21 (Comprehensive Person-Centered Care Planning);

xx. To ensure that appropriate and individualized care plans were developed and implemented for Mrs. Cooper;

xxi. To ensure that a comprehensive assessment of Nathalie Cooper's needs was promptly conducted and conducted again after a significant change in her physical or mental condition, which assessment was to be used to develop, review, and revise her comprehensive plan of care;

xxii. To ensure that a comprehensive person-centered care plan was developed for Nathalie Cooper, that included measurable objectives and timeframes to meet her medical, nursing, mental and psychosocial needs that should have been identified in her comprehensive assessment;

66

xxiii. To ensure that the comprehensive person-centered care plan that was developed for Nathalie Cooper which was reviewed and revised by the interdisciplinary team, after each assessment;

xxiv. To ensure that Mrs. Cooper received, and that they provided, the necessary care and services to attain or maintain her highest practicable physical, mental and psychosocial well-being, in accordance with an appropriate comprehensive assessment and plan of care;

xxv. To ensure that, based on Mrs. Cooper's comprehensive assessment:

1. Her abilities in activities of daily living did not diminish unless the circumstances of her clinical condition demonstrated that diminution was unavoidable;

2. She received the appropriate level of care which her condition required to keep her safe and protect her well-being; and

3. She received the appropriate treatment and services to maintain and improve her activities of daily living; and

4. While unable to carry out activities of daily living, she received the necessary services and assistance with her activities of daily living;

xxvi. To ensure that facility staff followed doctors' orders;

xxvii. To ensure that residents, including Mrs. Cooper, in need of assessment and treatment received that assessment and treatment in a timely manner;

xxviii. To ensure that Mrs. Cooper' physicians were timely notified regarding significant changes in her condition;

xxix. To ensure that Mrs. Cooper' family was timely notified regarding significant changes in her condition;

xxx. To ensure that defendants promoted care for the residents, including Mrs. Cooper, in a manner and in an environment that maintained or enhanced the residents' dignity and respect in full recognition of the residents' individuality;

xxxi. To ensure that resident services were provided in accordance with all applicable local, state and federal regulations and codes.

67

387. Additionally, Individual Defendants and Corporate Defendants by and through their managerial employees and agents, had the direct duty to ensure that they acted in accordance with the standards of practice of those responsible for owning, operating, managing, maintaining, supervising and/or controlling the provision of care at nursing homes, with similar training and experience situated in Henderson County, Hendersonville, North Carolina and/or similar communities, in the following ways:

a. Ensuring that Facility's staff (both professional and non-professional including employees, agents, and/or independent contractors) were properly hired in sufficient numbers, screened, trained, and supervised;

b. Ensuring that all staff was qualified, competent and fit to provide custodial and nursing care for the health, safety, and proper care of nursing home residents;

c. Ensuring that Facility had sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of their residents, including Nathalie Cooper, as determined by the facility assessment, resident assessments and individual plans of care, and considering the number, acuity and diagnoses of the facility's population, as required by 42 C.F.R. § 483.35 (Nursing Services);

d. Ensuring accurate, payroll-derived staffing data on a quarterly basis, as required by 42 C.F.R. § 483.70(p) (Payroll-Based Journal reporting);

e. Ensuring that Facility was managed, operated, and administered in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including Nathalie Cooper;

f. Ensuring the Facility was properly capitalized to ensure the proper care for, and treatment of, all residents including Nathalie Cooper.

g. Exercise reasonable care in the screening, admission, placement, monitoring, supervision, and (where appropriate) discharge of residents whose presence in the Facility posed a foreseeable risk of harm to other residents. This duty included:

68

i.     the duty to perform or obtain the federally required Level II PASRR screening for any resident with serious mental illness, intellectual disability, or related condition;

ii.     the duty to perform a competent pre-admission behavioral risk assessment;

iii.     the duty to integrate that risk assessment into the resident's plan of care;

iv.     the duty to staff the Facility to provide behavioral supervision commensurate with admissions decisions; and

v.     the duty to act protectively upon information that an admitted resident posed a sexual or behavioral threat to other residents.

## B. DEFENDANTS' BREACHES OF DUTY

388.     The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

389.     At all times relevant to this complaint, Defendants, by and through their employees, agents, officers, managers and directors, failed to use reasonable care and diligence in the application of their knowledge and skill to Nathalie Cooper's care.

390.     At all times relevant to this complaint, Defendants, by and through their employees, agents, officers, managers and directors, failed to use their best judgment in the treatment and care of Nathalie Cooper while a resident at Facility.

391.     At all times relevant to this complaint, all Defendants, by and through their employees, agents, officers, managers and directors, failed to provide Nathalie Cooper treatment which was in accordance with the standards of practice among members of the nursing profession and other health care professionals with similar training and experience situated in Henderson County, Hendersonville, North Carolina, and/or similar communities at all times material to this Complaint.

392.     More specifically, all Defendants, by and through their employees, agents, officers, managers and directors, violated the standards of care prevalent in the community or similar communities at the time treatment was rendered by their employees and/or agents to Nathalie Cooper, which constituted negligence on the part of Defendants, said negligence being a

proximate cause of the injury and death suffered by Nathalie Cooper. Defendants breached each of the duties owed to Mrs. Cooper, as set forth above, in the manner and to the extent pleaded in the preceding and following subsections. The factual allegations of corporate structure, fragmentation, related-party transactions, and dominion-and-control set forth in the Indirect Liability section above are incorporated herein by reference as evidentiary support for the breach allegations against the Corporate and Individual Defendants.

393. In particular, all Defendants, by and through their employees and/or agents were negligent in one or more of the following ways in that they, by and through their employees, officers, managers, directors and/or agents:

    a.  Admitted the Assailant, upon information and belief:

        i.  without the federally required Level II PASRR screening (for which they were subsequently cited under F-644);

        iii.  without a competent pre-admission behavioral risk assessment;

        iv.  without integrating that risk assessment into the Assailant's plan of care;

        v.  without staffing the Facility to provide commensurate behavioral supervision, and

        vi.  Defendants further breached by retaining the Assailant in the same general living area as Mrs. Cooper after the Assailant's documented sexual exposure to a nurse and after the DON's "Well, it's his right" response;

    b.  Directed, ratified, condoned and benefited financially from the dangerous admissions process that admitted the Assailant on or about June 3, 2024 without the necessary behavioral supervision mechanisms and staffing in place;

    c.  Failed to require, fund, or enforce adequate admissions, behavioral-management, supervision, and abuse-prevention policies sufficient to prevent foreseeable resident-on-resident sexual assault and to ensure timely diagnostic work-up of injuries such as Mrs. Cooper's femoral fracture;

    d.  Intentionally failed to provide sufficient nursing staff to assure resident safety, including by operating with average Daily HPPD of 2.45 in the first half of 2024,

70

with 38 days below 2.0 HPPD, 81 days below 2.5 HPPD, and zero Director-of-Nursing hours on all 78 weekend days of 2024 (including the date of death);

e. Directed, ratified, condoned, and benefited financially from the chronic understaffing, including by establishing and enforcing the staffing budgets, schedules, and contract-labor utilization that produced the dangerous Daily HPPD, weekend-DON, and contract-labor figures detailed in this Complaint, leaving the facility unable to deliver care meeting professional standards;

f. Diverted Facility operating revenues away from resident-facing staffing and care to related-party rent, related-party staffing fees, related-party management fees, related-party back-office services, and CHOW Debt, thereby starving the Facility of the resources required to staff and supervise it to professional standards;

g. Negligently credentialed, monitored, supervised, hired, trained, and retained (within the meaning of § 90-21.11(2)(b)) the Facility-level Administrator, Director of Nursing, and nursing personnel;

h. Failed to properly direct and supervise the abuse-prevention, abuse-reporting, QAPI, and incident-response policies that allowed the documented April 6, 2024 F-607 incident, the Assailant's earlier sexual exposure to a Facility nurse, and the "Well, it's his right" dismissal by the Director of Nursing to go unremediated;

i. Failed to provide those goods and services necessary to avoid physical harm and mental anguish to Mrs. Cooper, including but not limited to:

    i. the failure to prevent other male residents from entering her room unsupervised;

    ii. the failure to protect her from falls and injuries;

j. Failed to provide adequate supervision, assistance, and care to protect Mrs. Cooper from resident-on-resident sexual abuse;

k. Failed to maintain an environment free of accident hazards;

l. Failed to implement appropriate and effective interventions, including adequate supervision and assistance, to protect her from falls and injuries;

m. Failed to identify, assess, image, and treat Mrs. Cooper's femoral fracture during the twenty-five-day interval from May 18, 2024 to June 11–12, 2024, notwithstanding

71

repeated escalations from staff and contemporaneous nursing reports that she appeared to have a fractured hip;

n. Administered Morphine and Ativan to Mrs. Cooper beginning June 6, 2024 without ensuring the necessary work-up was performed to identify the underlying source of pain;

o. Failed to prevent Mrs. Cooper's personal belongings from being misappropriated;

p. The false Section 7 denial of chain-home-office affiliation on the OpCo's CMS Form 855A, made under penalty of perjury and certified by Friedman as the Authorized Official;

q. Failed to follow the proper nursing process of assessing, planning, implementing and evaluation in a timely manner;

r. Failed to conduct timely, accurate, and complete assessments following each of her falls, including the failure to conduct proper and timely neurological checks;

s. Failed to formulate and implement an appropriate comprehensive person-centered care plan that prescribed actions to achieve defined goals and objectives and provided guidance to the staff for the maintenance of her health, including the failure to formulate and implement appropriate plans to address her:
    i.   risk of falls;
    ii.  risk of pressure injuries;
    iii. risk of malnutrition;
    iv.  weight loss;
    v.   pain management;
    vi.  decline in activities of daily living, among other needs;

t. Failed to provide care to Mrs. Cooper in a timely manner;

u. Failed to appropriately assess in response to significant changes in Mrs. Cooper's condition;

v. Failed to obtain appropriate and timely medical treatment for Mrs. Cooper following a significant change in her condition, including following her May 18, 2024 fall and her June 2 to 5 decline;

w. Failed to prevent a functional decline in Mrs. Cooper;

72

x. Failed to maintain acceptable nutritional parameters for Mrs. Cooper, resulting in a significant weight loss and malnutrition;

y. Failed to implement appropriate interventions to prevent the development of pressure sores;

z. Failed to ensure that she received necessary treatment and services to prevent new pressure sores from developing, and after she developed pressure sores, to promote healing, including failure to implement a formal turning and repositioning program, the failure to ensure that pressure-relieving mattresses and chair pads were used consistently (with documented gaps in April 2022, November–December 2022, June–December 2023, and February–March 2024); failure to implement protective heel boots until May 2024, after severe damage had already occurred; and failure to use standard clinical staging (with wounds systematically misclassified as "skin tears," bruises, or generic "open/discolored areas", producing false MDS entries showing zero unhealed pressure ulcers despite internal notes detailing significant breakdown);

aa. Failed to maintain adequate and accurate documentation regarding her wound status;

bb. Failed to consistently escalate her needs for wound care to a higher level of care.

cc. Failed to implement appropriate interventions to prevent her from becoming contracted;

dd. Failed to promote care for Mrs. Cooper in a manner and in an environment that maintained and enhanced her dignity and respect in full recognition of her individuality;

ee. Failed to adequately train and supervise employees and/or agents or independent contractors to handle and provide proper nursing home care for residents;

ff. Failed to provide adequate nursing and support staff to carry out the plan of care;

gg. Failed to ensure that their nursing staff did not exceed their scope of practice;

hh. Failed to monitor and oversee the treatment which was prescribed and administered to Mrs. Cooper by their employees and agents;

ii. Failed to properly monitor and oversee the selection and retention of nurses and other health care providers practicing at the facility;

73

jj. Failed to properly monitor and oversee the compliance of all employees and/or agents with safety standards by which Defendants agreed to abide, including N.C. Gen. Stat. Chapter 131E, 10A NCAC 13D, 42 USC Ch. 4, Part 483;

kk. Failed to provide the necessary care and services to attain or maintain Mrs. Cooper's highest practicable physical, mental and psychosocial well-being, in accordance with an appropriate comprehensive assessment and plan of care;

ll. Failed to properly monitor, oversee, and ensure that documentation in Mrs. Cooper's medical record was accurate and reliable;

mm. Failed to maintain a QAPI program adequate to identify and remediate the systemic failures pleaded throughout this Complaint;

nn. and other acts of negligence and gross negligence not specifically enumerated herein but to be developed and determined through further discovery in the action.

394. As a direct and proximate result of the negligence complained of above, Mrs. Cooper suffered injuries and harm as set forth herein, including but not limited to a femur fracture, a rape while suffering from an untreated fractured femur, pressure sores and skin tears, a her untimely wrongful death. As a result of the physical injuries inflicted upon Mrs. Cooper, she required medical attention, endured physical pain and mental suffering, sustained a loss of dignity, individuality, and autonomy, and suffered a painful and untimely death.

## C. CAUSATION AND HARM TO MRS. COOPER

### 1. Foreseeability

395. The preceding paragraphs are incorporated herein by reference as if fully set forth herein word for word.

396. Foreseeable injuries are preventable injuries.

397. Foreseeability is important because North Carolina law aims to deter conduct that causes foreseeable harm. *E.g.*, *Haarhuis v. Cheek,* 255 N.C. App. 471, 805 S.E.2d 720 (2017).

398. Nursing facilities care for a population that, by definition, includes residents with cognitive impairment, dementia, behavioral disturbance, sexual disinhibition, and a documented inability to recognize or consent to sexual contact or to protect themselves from physical harm.

74

399. Resident-on-resident sexual assault and unaddressed clinical change-of-condition are long-recognized and widely studied risks of the nursing-facility environment.

400. Resident-on-resident abuse is foreseeable in skilled nursing homes.

401. Resident-on-resident abuse is foreseeable to the employees, owners, operators, officers, directors and managers of skilled nursing facilities because they know that many residents suffer from cognitive or mental health disorders.

402. Resident-on-resident abuse becomes more foreseeable when a facility chooses to admit high-risk residents, including residents with multiple felony convictions and serious mental illness.

403. Falls and fall-related injuries are foreseeable to nursing homes, and to the employees, owners, operators, officers, directors and managers of skilled nursing facilities because they know that elderly patients – particularly those with physical or mental disabilities (including dementia) – have an elevated risk of suffering a fall-related injury.

404. CMS has expressly recognized through 42 C.F.R. § 483.12 that every nursing-facility resident has the right to be free from abuse, including resident-on-resident sexual abuse, and that the Facility bears the regulatory duty to prevent such abuse.

405. CMS has similarly recognized through 42 C.F.R. § 483.25(d) that residents must receive adequate supervision and assistance devices to prevent accidents.

406. A skilled nursing facility is required to ensure its facility has sufficient staff to assure residents' safety, which includes providing adequate supervision to prevent resident-on-resident abuse, and falls. 42 CFR § 483.35.

407. There is considerable evidence of a relationship between nursing home staffing levels and resident outcomes. The CMS Staffing Study found a clear association between nurse staffing ratios and nursing home quality of care.

408. Higher nurse staffing improves the process and the outcome measures of nursing home quality.

409. Lower nurse staffing increases the risk of harm and injury to residents, including the risk of falls and fall-related injuries and death.

75

410. It was and continues to be foreseeable to employees, owners, operators, officers, directors and managers of skilled nursing facilities that the risk of harm, injury and death to residents increases when facilities are understaffed.

411. CNAs are physically present on the unit performing the rounding, toileting, transfers, and observation by which one resident's movement toward another is observed and interrupted. Defendants' average CNA staffing in 2024 — approximately 1.7 CNA HPPD — was insufficient to meet the duty to supervise residents and ensure they were free from abuse, including resident-on-resident sexual abuse.

412. Defendants' average floor RN HPPD of approximately 0.30 in 2024, with multiple individual days at or below 0.16 floor RN HPPD, meant that the licensed clinician needed to assess and act upon Mrs. Cooper's May 21, 2024 change in condition and her June 2 through 5 change in condition, to order timely imaging for her suspected hip fracture, and to update her care plan to reflect heightened vulnerability simply did not exist on the schedule for during that time frame.

413. Defendants reported zero Director of Nursing hours on every weekend day of 2024, including Saturday, June 15, 2024 — the day Mrs. Cooper died.

414. Resident-on-resident sexual assault, unaddressed clinical change-of-condition, and the unaddressed femoral fracture sustained by Mrs. Cooper were the statistically predictable, expected, and previously noticed outcomes of operating a 134-bed skilled-nursing facility that admitted high-risk residents and that staffed itself at deficient levels.

415. The unaddressed femoral fracture and sexual assault suffered by Mrs. Cooper were foreseeable. Defendants knew, or in the exercise of ordinary diligence should have known, that their Facility, staffed at the levels they mandated and populated with the residents they chose to admit, could not prevent foreseeable falls, could not properly assess and document changes in condition, could not respond to nurse reports of dangerous behavior, and could not prevent foreseeable resident-on-resident sexual contact.

**2. Causation**

416. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

417. The chain of events that resulted in Mrs. Cooper's falls, her femur fracture, her sexual assault on June 12, 2024, and ultimately her death on June 15, 2024, is the direct and predictable consequence of the staffing conditions, the admissions practices, and the corporate priorities described above.

418. The change in condition that resulted in the discovery of her femur fracture went clinically unaddressed for at least three weeks because the RN staffing required to evaluate, image, and escalate Mrs. Cooper's suspected hip fracture was structurally absent.

419. The Assailant was admitted and retained because the Defendants' admissions and revenue policies prioritized census and revenue over resident safety and treated high-risk residents as a means to fill beds without regard to the clinical, behavioral, and staffing infrastructure.

420. The 1:00 a.m. June 12, 2024 sexual assault occurred during a period when neither resident was being observed because there were not enough direct-care staff present on the overnight shift to observe, monitor, or interrupt the Assailant's movement into the room of a bed-bound 100-year-old woman with a freshly confirmed hip fracture.

421. The combined physiological and psychological trauma of the assault, on top of the unaddressed femoral fracture, on a 100-year-old hospice patient, was the direct and proximate cause of Mrs. Cooper's death three days later.

422. A properly staffed Facility would have identified Mrs. Cooper's femoral fracture on May 21, 2024, would have intervened upon the Assailant's admission or behavior, and would have prevented the June 12 sexual assault.

423. Defendants' chronic understaffing and dangerous-admissions policy were a direct and proximate cause of the failure to diagnose the fracture, of the failure to update Mrs. Cooper's care plan, of the June 12 sexual assault, of the injuries documented at the hospital, and of Mrs. Cooper's death on June 15, 2024.

### 3. The Death of Mrs. Cooper, June 15, 2024

424. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

425. Mrs. Cooper died on June 15, 2024, three days after the sexual assault and the midnight June 11–12 confirmation of her undetected femoral fracture.

426. Plaintiff is informed and believes, and on that basis alleges, that the proximate causes of Mrs. Cooper's death include the untreated femoral fracture and the cumulative physiological and psychological insult of the sexual assault, both of which were proximately caused by the negligent, grossly negligent, and willful, wanton, and reckless acts and omissions of the Defendants set forth in this Complaint.

**4. Harm and Injuries Sustained by Mrs. Cooper and the Estate**

427. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

428. As a direct and proximate result of Defendants' breaches of duty set forth above, Mrs. Cooper sustained personal injuries including an undiagnosed and untreated femoral fractures; the unnecessary and dangerous administration of opioid and benzodiazepine medications in lieu of fracture work-up; a perianal sexual assault perpetrated on June 12, 2024 by an unscreened, high-risk male resident whom Defendants had admitted in conscious disregard of his known risk; severe physical pain and suffering; severe emotional distress, humiliation, and indignity; loss of dignity in the final days of her 100-year life; and the conscious experience of mistreatment and assault while in Defendants' custody and care.

429. As a further direct and proximate result of Defendants' conduct, Mrs. Cooper died on June 15, 2024, giving rise to damages recoverable under N.C. Gen. Stat. § 28A-18-2, including expenses for the care, treatment, and hospitalization incident to the injury resulting in death; compensation for her physical pain and mental suffering; the reasonable funeral expenses of the decedent; the present monetary value of the decedent to the persons entitled to receive the damages recovered (including loss of net income, services, protection, care, assistance, society, companionship, comfort, guidance, kindly offices, and advice of the decedent); such punitive damages as the decedent could have recovered pursuant to N.C. Gen. Stat. Chapter 1D had she survived; and nominal damages where the jury so finds.

430. Plaintiff is therefore entitled to recover an amount in excess of twenty-five thousand dollars ($25,000.00) from Defendants.

## XII.    SECOND CLAIM FOR RELIEF: WRONGFUL DEATH and SURVIVAL

431.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

432.    The negligent, grossly negligent, and willful and wanton acts and omissions of all Defendants, jointly and severally, as herein alleged, were a direct and proximate cause of Nathalie Cooper experiencing conscious physical and mental pain and suffering. In addition, the negligent, grossly negligent, and wilful and wanton acts and omissions of these Defendants, jointly and severally, as herein alleged, were a direct cause of Nathalie Cooper's death. Plaintiff is entitled to all damages allowed by N.C.G.S. § 28A-18-2(b), all in an amount in excess of $25,000.00.

433.    In the alternative, and in the event it is determined that Nathalie Cooper's death was not caused by the negligence of Defendants, or one or more of them, then Plaintiff asserts a survival claim and is entitled to all those damages that Nathalie Cooper could have recovered had she lived, all in an amount in excess of $25,000.00.

## XIII: THIRD CLAIM FOR RELIEF: UNFAIR AND DECEPTIVE TRADE PRACTICES

### (N.C. Gen. Stat. § 75-1.1; Against the Corporate Defendants and the Individual Defendants)

434.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

435.    **Duty.** Defendants owed a duty to refrain from unfair or deceptive acts or practices in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1, in connection with the marketing, advertising, contracting for, and provision of long-term-care services to Mrs. Cooper and to the public.

436.    **Commerce.** The conduct of Defendants pleaded in this Complaint occurred in or affected commerce within the meaning of N.C. Gen. Stat. § 75-1.1, in that Defendants advertised, marketed, contracted for, and provided long-term-care services to Mrs. Cooper and to the

public for compensation, including private-pay compensation, Medicare reimbursement, and Medicaid reimbursement.

437. **Breach.** Defendants engaged in unfair and deceptive acts and practices in or affecting commerce, including by marketing and holding out the Facility as a provider of safe, adequate, and resident-centered nursing-facility care while simultaneously operating the Facility at staffing levels Defendants knew were materially below the levels reasonably necessary; charging Mrs. Cooper a private-pay rate (escalating from $6,800 to $9,100 per month) for nursing services Defendants knew, or should have known, they were not staffed to deliver; representing through admissions materials, marketing, signage, and trade names (including the rebranding from "Accordius Health" to "Orchard Valley") that residents would receive person-centered, dignified, and safe care while concealing that the Facility was operated as a financially extractive shell; submitting (or causing to be submitted) a CMS Form 855A on which the existence of a chain home office, Ascent Management, was denied; and failing to disclose to Mrs. Cooper and her family at and after admission the Facility's actual staffing levels, actual reliance on contract labor, prior survey history, and contemporaneous admission of a high-risk male resident without performing the federally required Level II PASRR screening.

438. **Causation.** Defendants' unfair and deceptive acts and practices proximately caused injury to Mrs. Cooper and to her Estate, in that Mrs. Cooper paid a private-pay rate for services Defendants were not staffed to deliver and was thereby exposed to and ultimately suffered the catastrophic injury and death pleaded above.

439. **Damages.** Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, Plaintiff is entitled to recover treble damages, the reasonable attorneys' fees of the Estate, and such other relief as the Court deems just and proper.

440. **Liability of Each Defendant.** Each Defendant that participated in the marketing, holding out, billing, or operation of the Facility is liable, and additionally under the indirect-liability theories pleaded above. Each Individual Defendant who directed, authorized, participated in, or ratified the unfair and deceptive acts and practices is liable by virtue of personal participation.

## X1V: FOURTH CLAIM FOR RELIEF: PUNITIVE DAMAGES

## (N.C. Gen. Stat. §§ 1D-5, 1D-15, 1D-15(c); Against All Defendants)

441. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

442. Pursuant to N.C. Gen. Stat. § 1D-15, punitive damages may be awarded where the claimant proves by clear and convincing evidence the existence of one or more aggravating factors, including "willful or wanton conduct," related to the injury for which compensatory damages are awarded.

443. Pursuant to N.C. Gen. Stat. § 1D-15(c), punitive damages may be awarded against a corporate Defendant where the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor.

444. The above acts and failure to act of the Individual Defendants and the Corporate Defendants, by and through their employees, agents, officers, managers and directors as thoroughly detailed in all of the above paragraphs, were intentional, grossly negligent, and willful or wanton. They were performed in conscious disregard of and indifference to the rights and safety of Nathalie Cooper; and Defendants by and through their employees, agents, officers, managers and directors, knew or should have known that the above acts or failure to act were reasonably likely to result in severe physical and/or mental suffering.

445. The Individual Defendants and Corporate Defendants, by and through their employees, agents, officers, managers, officers, and directors, upon information and belief, and with the condonation and/or participation of their managerial employees, director and officers, demonstrated conscious and intentional disregard of and indifference to the rights and safety of Nathalie Cooper and others similarly situated demonstrated by their:

   a. continuing and knowing failure to effectively administer the Facility;

   b. business practice of attempting to care for residents with an inadequate number of insufficiently qualified staff, which their officers, directors and managers knew or should have known was reasonably likely to result in injury to the resident and other residents. Defendants knew that they had reported 38 days in 2024 below 2.0 HPPD, 81 days below 2.5 HPPD, and 193 days (over 70% of the year) below 3.0 HPPD; and

81

they knew, because they generated the underlying payroll, that the Director of Nursing had worked zero hours on every weekend day of 2024 (78 of 78 weekend days), including the day Mrs. Cooper died;

c.  business practice of overworking staff, which their officers, directors, and managers knew or should have known was reasonably likely to result in injury to Nathalie Cooper and their other residents;

d.  business practice of insufficiently training staff, which their officers, directors and managers knew or should have known were reasonably likely to result in injury to Nathalie Cooper and their other residents;

e.  business practice of hiring and retaining staff who they knew or should have known had and would neglect residents and thereby cause injury to Nathalie Cooper and their other residents;

f.  intentional failure to follow state and federal laws on staffing and administration of the facility;

g.  ongoing failure to implement appropriate interventions to protect residents, including Nathalie Cooper, from harm and injury;

h.  ongoing practice of admitting dangerous residents to the facility, as they prioritized profit over safety, which resulted in the admission of the Assailant to the facility despite their inability to properly supervise him and his behaviors;

i.  ongoing business practice of knowingly and intentionally focusing on profits instead of care, which led to understaffing and undercapitalization of the Facility, which led to inappropriate and inadequate care to the residents, including Nathalie Cooper;

j.  business practice of implementing and requiring staff to adhere to policies which they knew or should have known would cause their staff to exceed their scopes of practice and violate their best judgment;

k.  and all of the other business practices described in this Complaint, all of which led to the staff of Facility's recurring inability to keep their residents safe, as is described in more detail in the foregoing paragraphs; and

l.  other acts and omissions, which will be shown at the trial of this matter.

82

446. Defendants had actual notice that the Facility had been previously cited under F-607 for the failure to report an "inappropriate touching" incident on April 6, 2024 (two months before the Cooper assault), and that the Facility's DON had dismissed a nurse's prior report of the Assailant's sexual exposure with the statement "Well, it's his right."

447. Defendants had actual notice that the Facility had a long-standing history of deficient care practices resulting in harm to their residents but failed to implement appropriate corrective measures to ensure safe resident care.

448. Defendants knew they had become structurally dependent on related-party contract labor, with contract labor exceeding 80% of LPN hours in 2024 and exceeding 70% of CNA hours in the month of Mrs. Cooper's death.

449. Defendants knew the contract-heavy, revolving-door staffing model precluded the continuity of clinical assessment and behavioral monitoring required to prevent foreseeable resident-on-resident sexual contact.

450. Defendants knew that the operating revenues of the Facility flowed upstream and outward through related-party rent, related-party staffing fees, and centralized management fees, rendering the OpCo itself effectively undercapitalized while its corporate principals took distributions.

451. Defendants knew, because Friedman certified it, that the OpCo's Medicare Enrollment Application denied the existence of a chain home office — a denial that, on information and belief, was false.

452. Defendants knew, because they processed Medicare reimbursements through it, that the predecessor operator's bank account remained the only active Medicare EFT account from January 1, 2024 through June 5, 2025 — seventeen months, including the day Mrs. Cooper was assaulted and the day Mrs. Cooper died.

453. Defendants rebranded the Facility at least twice in approximately twenty-seven months while the underlying staffing deficiencies, admissions practices, and corporate structure persisted, and failed to submit any daily PBJ data for the third quarter of 2024.

454. In the final weeks of her 100-year life, Defendants subjected Mrs. Cooper to the cumulative insult of a missed femoral fracture, opioid and benzodiazepine administration in

83

the absence of fracture work-up, and a perianal sexual assault, and then transmitted a contemporaneous Allegation of Compliance for the federal abuse citation through a chain home office whose existence the OpCo had denied to the federal government.

455. Each of the foregoing facts is proven, or capable of being proven, by Defendants' own filings with CMS, by Defendants' own payroll and cost-report records, by the CHOW transactional documents, and by the contemporaneous records of Facility staff and visitors.

456. The repeated, knowing, and uncorrected nature of Defendants' conduct, sustained across multiple years, three multiple trade names, and at least seven quarters of CMS-required disclosure preceding Mrs. Cooper's death, constitutes willful or wanton conduct within the meaning of N.C. Gen. Stat. § 1D-5(7) and supports an award of punitive damages under N.C. Gen. Stat. § 1D-15.

457. Pursuant to N.C. Gen. Stat. § 1D-15(c), Defendants Friedman, Zanziper, and Hyman, as well as Administrator Hardin and the then-existing Director of Nursing, each in their respective roles as officers, directors, members, managers, or controlling individuals of the Corporate Defendants, personally participated in and/or condoned the conduct constituting the aggravating factors set forth above.

458. Each Individual Defendant therefore subjects the Corporate Defendants under whose authority he or she acted to the imposition of punitive damages.

459. The conduct of Defendants pleaded above constitutes willful or wanton conduct within the meaning of N.C. Gen. Stat. § 1D-5(7) in that it was the conscious and intentional disregard of and indifference to the rights and safety of others, which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm.

460. Defendants' conduct was the product of conscious and considered business decisions made and ratified by the Individual Defendants in their respective capacities, with knowledge derived from Defendants' own PBJ submissions, cost reports, survey results, ePOC distribution lists, HCPI investigations, and internal communications, of the harm reasonably likely to result.

84

461.  Defendants' conduct further satisfies one or more of the aggravating factors enumerated in N.C. Gen. Stat. § 1D-15, including "willful or wanton conduct," as established by clear and convincing evidence.

462.  Pursuant to N.C. Gen. Stat. § 1D-15(c), the Corporate Defendants are subject to punitive damages because the Individual Defendants identified above, in their respective capacities as officers, directors, members, managers, and controlling persons of the Corporate Defendants, as well as the Facility Administrator, the Facility Director of Nursing, and other management and supervisory personnel at the Facility, participated in or condoned the conduct constituting the aggravating factor.

463.  Plaintiff is therefore entitled to recover punitive damages against each Defendant in an amount sufficient to punish Defendants and to deter Defendants and other similarly situated nursing-facility operators in North Carolina from continuing the practices pleaded in this Complaint.

464.  Each Corporate Defendant is liable for punitive damages by virtue of the conduct of its officers, directors, members, managers, and controlling persons.

465.  Each Individual Defendant is liable for punitive damages by virtue of his or her personal participation in the willful or wanton conduct pleaded above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court for the following relief:

1.  That he have and recover judgment against all Defendants, jointly and severally, a sum in excess of $25,000.00 for all damages, actual and punitive, and as allowed by N.C.G.S. § 28A-18-2(b);

2.  That Plaintiff have and recover judgment against the Defendants, jointly and severally, a sum in excess of $25,000.00 for all damages, actual and punitive, that Nathalie Cooper could have recovered against Defendants had she lived;

3.  Treble damages and reasonable attorneys' fees pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, in an amount in excess of $25,000.00, on Plaintiff's UDTPA claim;

4.  That this matter be tried by a jury;

85

5. That Plaintiff receives costs, pre- and post-judgment interest, and all other appropriate relief available in the foregoing causes of action.

6. For such other and further relief as the Court may deem just and proper.

Respectfully submitted, this the 9th day of June, 2026.

HENSON FUERST, P.A.

By: /s/Carmaletta L. Henson

Carmaletta L. Henson
carma@lawmed.com
State Bar No.: 26494 NC
P.O. Box 7008
2317 Sunset Avenue
Rocky Mount, NC 27804-7008
Telephone: (252) 443-2111
Service email:service@lawmed.com

86